B. J. PARMELE v. KENNETH EATON.

(Filed 9 July, 1954.)

**1. State § 2b—**

The State Board of Education was given sole authority by the statute now codified as G.S. 146-94 to sell and convey all vacant, unentered marsh and swamp lands of the State, provided such lands are not covered by navigable waters and the quantity in any one marsh or swamp exceeds two thousand acres, and a conveyance by the State Board of Education of such marshlands (G.S. 146-4) subsequent to the effective date of the statute conveys title.

**2. Same—**

Evidence to the effect that the *locus in quo* conveyed to plaintiff's predecessors in title by the State Board of Education subsequent to the effective date of the statute codified as G.S. 146-94, was marshland of more than two thousand acres in area, covered with marsh grass and not navigable by any kind of commercial craft, even at high tide, *is held* to sustain the findings of fact of the trial court that the land in question was a part of a tract of marshland in excess of two thousand acres and that no part of the *locus* was covered by navigable waters.

**3. Waters and Watercourses § 11—**

The test in this State for determining whether waters are navigable is not the ebb and flow of the tide, but whether the waters are suitable for the purpose of navigation by vessels or boats such as are employed in the ordinary course of water commerce, trade and travel, and are thus navigable in fact.

**4. Judgments § 32—**

Judgment adjudicating title under a State grant and conveyances from the State Board of Education to a large tract of land *held* not to bar a subsequent suit involving title under conveyance from the State Board of Education to a small portion of the land involved in the former case, in view of new facts alleged in the pleadings and developed at the trial, and an intervening Act of the General Assembly (Ch. 966, Session Laws of 1953) validating titles conveyed by the State Board of Education.

APPEAL by defendant from *Clifton L. Moore, Resident Judge* of the Eighth Judicial District, at Chambers in Wilmington, 30 January, 1954. From NEW HANOVER.

Suit for specific performance submitted to judge and heard by consent on waiver of jury trial (G.S. 1-184; 1-185; 1-218; 7-65).

The tract of land in suit is located along the northern extension of Wrightsville Beach in New Hanover County. It is shown within the dotted lines on the accompanying exhibits. At low tide the land is completely exposed, but at high tide it is covered by tidal waters from Banks Channel, shown on aerial photograph, Exhibit B. The plaintiff claims title through mesne conveyances from (1) the State of North Carolina and (2) the State Board of Education of North Carolina. The *locus in quo* constitutes about one-third of the lands involved in the previous action entitled *Resort Development Company v. Parmele,* the appeal from which was heard and determined in this Court at the Spring Term, 1952, and is reported in 235 N.C. 689, 71 S.E. 2d 474. An examination of the statement of facts and opinion of the Court in that case will serve to point up material differences in the facts there agreed and those here developed and found.

The plaintiff, being under contract (dated 1 November, 1953) to convey to the defendant the *locus in quo,* tendered deed sufficient in form to vest in defendant fee-simple title to the property. The defendant refused tender, alleging title offered to be defective on these grounds: (1) that the land is covered by navigable waters and therefore was not subject to grant by the State of North Carolina or to sale and conveyance by the State Board of Education; and (2) that the plaintiff is estopped by the decision of this Court in *Resort Development Company v. Parmele, supra,* to assert title to the property.

The trial court, after hearing the evidence offered by the parties, found facts, made conclusions of law, and entered judgment, the gist of which follows:

### FINDINGS OF FACT.

"2." That the tract of land in controversy lies west of and adjacent to the causeway leading to the sewerage disposal plant at the north end of

PARMELE *v.* EATON.

Wrightsville Beach and fronts 1295 feet on the causeway and extends southwestwardly toward Harbor Island for a distance of about 700 feet.

"3." That the plaintiff holds title to the portion of the property to the north of line A-B as shown on Exhibit A by *mesne* conveyances from the State Board of Education; that the plaintiff holds title to the property south of line A-B through *mesne* conveyances from the State Board of Education and by grant from the State of North Carolina (the Sneeden grant of 1841).

"4. That the portion of the property to the North of line A-B was conveyed by the State Board of Education . . . in 1926 to plaintiff's predecessor in title for $3.00 per acre and that at the time of such conveyance was marshland and a portion of a tract of marshland in excess of 2,000 acres. That the portion of the property to the South of line A-B which plaintiff holds through *mesne* conveyances from the State Board of Education was conveyed by the State Board of Education . . . to the plaintiff's predecessor in title for $25.00 per acre in the year 1944 and at the time was marshland and part of a continuous tract of marshland in excess of 2,000 acres."

"5." That in the year 1926 Moore's Inlet, where the waters of the Atlantic Ocean break through the outer bank between the *locus in quo* and Shell Island as shown on Exhibit B, was south of the *locus* and since that time has moved in a northwardly direction and is now north thereof; that as Moore's Inlet moved northwardly the *locus in quo* at times was covered with sand which had the effect of killing the marsh grass which had grown upon it.

"6." That the property in controversy is bounded as follows: On the south by a lagoon known as Sunset Lagoon as shown on Exhibit A; on the west and north by a small canal which was cut and dredged by the plaintiff in order to pump sand and mud onto the *locus in quo* for the purpose of raising it above the level of high water; on the east by the causeway leading to the sewerage disposal plant, the right of way of which was conveyed to the Town of Wrightsville Beach by the plaintiff's predecessor in title. Before the land was built up with sand and mud pumped in from the dredging operation, the *locus in quo* "consisted of marsh land covered with marsh grass and was completely out of water at low tide, but at normal high tide was covered with water to a depth of approximately 2 feet and within 6 inches of the top of the marsh grass."

"7. That prior to dredging in Sunset Lagoon and to the West and North of the *locus in quo* the plaintiff obtained permission for the dredging and filling from the U. S. Corps of Engineers acting by authority of the Secretary of Army under the provisions of Section 10 of the Act of Congress approved March 3, 1899, entitled 'An Act Making Appropriations for the Construction, Repair and Preservation of Certain Public Works on Rivers and Harbors, and for Other Purposes.' "

"8." That the causeway to the sewerage disposal plant was built by the use of a dragline in approximately the year 1944 by the Town of Wrightsville Beach, a municipal corporation.

"9. That Sunset Lagoon is an artificially dredged body of water extending from Banks Channel and is used by small outboard motor boats and skiffs. That there is no public terminus on Sunset Lagoon and that it has not been and cannot be used by sea vessels or vessels in commerce

for any navigable purpose. That running to the Northwest adjacent to Harbor Island approximately 1,000 feet from the *locus in quo* is a slough known as Spring Landing Channel which connects Banks Channel to the Inland Waterway. That at low tide it is possible to pole or push boats through said slough and at high tide boats drawing three feet of water can go through it but it is not navigable for sea vessels or vessels in commerce, nor is it used by vessels in commerce.

"10. That at low tide prior to the fill made by the plaintiff it was impossible for any boat to navigate over the *locus in quo* which was covered by marsh grass. At high tide it was possible to push or pole a flat bottom boat through the marsh grass but that it was not navigable to power boats or sea vessels, nor was it used as a channel of commerce. That there are no navigable sloughs or guts which enter into the *locus in quo*.

"11. That the *locus in quo* was a portion of the property which was involved in the case of *Resort Development Company v. Parmele* reported in 235 N. C. Reports, page 689. That the decision in that case involved the *locus in quo* and additional property to the West of the *locus in quo*. That since the decision in that case the North Carolina Legislature passed Chapter 966 of the Session Laws of 1953 which was an Act to Validate and Confirm Titles to Marsh and Swamp Lands heretofore conveyed by the State of North Carolina and the State Board of Education . . . That this Act was ratified and in effect as of 23 April, 1953, prior to the purchase by the plaintiff of the *locus in quo*. That the additional facts presented in the present case as heretofore recited together with the passage by the Legislature of the validating act prevent the plaintiff B. J. Parmele from being estopped by his conduct or by the former judgment to prosecute this case. Nor is the former decision *res judicata* as to this hearing."

CONCLUSIONS OF LAW.

"1. That the *locus in quo* is a part of a continuous area in excess of 2,000 acres of marsh land.

"2. That no part of the *locus in quo* is or was covered at any state of the tide by waters which are navigable in fact.

"3. That the plaintiff B. J. Parmele is neither estopped by the former judgment in *Development Company v. Parmele* nor by his conduct to prosecute this case.

"4. That by virtue of the deeds from the State of North Carolina, the State Board of Education of North Carolina and Chapter 966 of the 1953 Session Laws of North Carolina, the plaintiff is vested with a good and marketable title to the *locus in quo* and can convey the same to the defendant herein."

From judgment entered directing that the defendant accept the plaintiff's tender of deed and comply with the terms of the contract, the defendant appealed, assigning errors.

*Hogue & Hogue for plaintiff, appellee.*

*Robert E. Calder for defendant, appellant.*

*Attorney-General McMullan and Samuel Behrends, Jr., Member of Staff, amici curiae on behalf of the State Board of Education.*

JOHNSON, J.  Our study of the record leaves the impression that the judgment below should be upheld.  We rest decision on the findings of fact which bring the conveyances made by the State Board of Education to the plaintiff's predecessors in title within the purview of the statutes authorizing and validating sales and conveyances of marsh or swamp lands.  In this view of the case the question whether the Sneeden grant of 1841 is valid becomes moot.

By statute enacted prior to 1926, now codified as G.S. 146-94, the State Board of Education was given sole authority to sell and convey all vacant unentered marsh and swamp lands of the State where, as limited by the provisions of G.S. 146-1, the land is not covered by navigable waters and the quantity in any one marsh or swamp exceeds 2,000 acres.  See *Insurance Company v. Parmele*, 214 N.C. 63, pp. 69 and 70, 197 S.E. 714. See also Chapter 151, Public Laws of 1941, and Article IX, Sec. 9 (formerly 10), Constitution of North Carolina.

By statute enacted prior to 1926, now codified as G.S. 146-4, it is provided that the words "swamp lands" as used in G.S. 146-94 "shall be construed to include all those lands which have been or may now be known and called . . . 'marsh' lands, 'pocosin bay,' 'briary bay,' and 'savanna,' . . ."

By Chapter 966, Session Laws of 1953, ratified 23, April, 1953, applicable to the counties of New Hanover, Pender, and Onslow, it is provided in pertinent part that: "The titles to all marsh lands and all swamp lands which have heretofore been conveyed by . . . the State Board of Education of North Carolina . . . are hereby validated, ratified and confirmed, and the persons, firms or corporations to whom such marsh lands or swamp lands have been conveyed or granted or their successors in title are hereby declared to have such title thereto as was purported to be conveyed or granted by any of the conveyances or grants hereinbefore referred to, as fully and as completely as said conveyances or grants purported to convey or grant the same; . . ."

It is manifest that the deeds made in 1926 and 1944 by the State Board of Education to the plaintiff's predecessors in title were made in contem-

plation that portions of a single tract of more than 2,000 acres of marsh lands were being conveyed.

The trial court found that when the *locus in quo* was conveyed by the State Board of Education to the plaintiff's predecessors in title in 1926 and in 1944, respectively, the land so conveyed was "marsh land and a portion of a tract of marsh land in excess of 2,000 acres." The lower court also found that no part of the *locus* is or was covered at any stage of the tide by waters which are navigable in fact. These are the crucial, determinative findings and conclusions. The defendant challenges the sufficiency of the evidence to support these findings. This brings into focus the testimony of the plaintiff and his witnesses.

The plaintiff testified that the *locus* "is a part of the marsh land which lies behind the banks at Wrightsville Beach and Shell Island. There are many more than 2000 acres of marsh land in the area, perhaps 50,000 acres. It is a complete body of marsh land going right up to Pamlico Sound . . ."

Richard F. Meier, member of the Board of Aldermen of Wrightsville Beach, testified in part: "In 1926 Moore's Inlet was somewhere about Columbia Street. . . . south of the pier . . . shown (on the aerial photograph) going out into the ocean. . . . The land . . . to the west of and adjacent to the . . . Disposal Plant was marsh land. By marsh land I mean that it was land with grass growing on it. . . . At exceptionally high water the whole marsh was covered with approximately 6 inches of water over the marsh. . . . Sunset Lagoon which is shown on the exhibit was dredged out. . . . Hugh MacRae & Company dredged it out for the purpose of building more land. . . . There is no public terminus or any sort of terminus in Sunset Lagoon. There is no public dock . . . anywhere in that area. Commercial shrimp boats do not go up in that area as they can't get by the bridge. (See highway bridge on aerial photo, Exhibit B.) The bridge isn't high enough . . . and they wouldn't have water enough. . . . the area to the west of Wrightsville Beach, just before you get to the beach, is called Harbor Island. . . . I have never seen a boat navigate over the area on the map . . . shown in green. (the land involved in the case—shown on Exhibit A within the dotted lines) . . . at all times since 1926 up until the dredging took place in 1953 that area (referring to the *locus in quo*) was covered with marsh grass. . . . The land . . . was a part of a continuous tract of marsh land which ran in every direction. . . . between the banks and the mainland."

The witness Ernest Woolard testified he has lived in the vicinity of Wrightsville Beach for thirty years and is engaged in the business of boating—taking fishing parties out in the ocean. He said in part: ". . . Moore's Inlet in . . . 1926 was some distance back to the south from where it is presently located. . . . At that time the land to the north and

northwest of Moore's Inlet was a continuous marsh from Stokeley's Channel which goes through here to the end of Harbor Island, except for two creeks which went through the marsh, one closer up here to the northwest and the other down toward the east. All the rest was marsh. There was one creek up close to the end of Harbor Island. It was just a creek. . . . It is not possible to navigate a boat into this marsh land. . . . After the inlet moved to the north the sand beat across it and wherever the sand beat across the marsh it killed the marsh grass. . . . Marsh grass won't grow on sand. . . . Marsh grass won't grow unless it's covered with salt water on high tide . . . At an average high tide most of the marsh land would be covered by water a foot or a foot and a half. . . . The little channels which run through the marsh grass are called little guts. They are just little drains. It is not possible to navigate in those guts. . . . I don't think it is possible to navigate any kind of a boat over marsh grass at high tide. . . . you could drag a row boat over it. . . . I am familiar with the area on Exhibit B shown in green (now in dotted lines) prior to its being filled. It was not possible to navigate a boat in it at any stage of the tide. It was marsh grass. . . . there was no kind of fishing that could be done with a small skiff in that area. You couldn't do nothing because the grass was out on high tide. It was impossible to use that for any sort of navigation."

D. B. George, whose business is fishing in the Wrightsville area, said Harbor Island was created by being "pumped up." He testified in part: "I worked on the dredge that pumped up Harbor Island in . . . 1917. . . . Captain Price carried this dredge around through Spring Landing Channel (shown on aerial-photo, Exhibit B) which goes in just below where the bridge is at Wrightsville. . . . This is the channel shown to the north end of Harbor Island which goes around to the Inland Waterway. . . . I had occasion to try to get through Spring Landing Channel last winter. I was in a boat which drew about two feet of water. The tide was about two hours ebb, that is two hours after high tide. . . . My son thought we could get through, so we went on and got about half way down the channel and found we couldn't get through. . . . Spring Landing Channel is not used for commercial boats of any kind. It's not used for nothing more than fellows going oystering and clamming. . . . Fishermen don't use Spring Landing Channel, they use Stokeley's Channel going out the Inland Waterway. . . . It is possible to get through Spring Landing Channel at high tide with a small boat which draws two feet of water."

Clyde Harrelson testified: ". . . The tide normally rises 3½ feet at Wrightsville Beach. . . . No commercial fishing boats fish in the area of Sunset Lagoon. . . . The area (in controversy) is a part of a tract of

marsh land which is in excess of 2,000 acres that runs from the beach to the mainland."

The foregoing testimony and other evidence of like import supports the crucial findings of fact of the court below to the effect (1) that the land in question when conveyed by the State Board of Education was part of a tract of marsh land in excess of 2,000 acres and (2) that no part of the *locus* is or was covered by waters which are navigable in fact.

With us the ebb and flow of the tide is not the criterion for determining navigability. The more practical test is whether, in its ordinary state, a body of water has capacity and suitability for the usual purpose of navigation by vessels or boats such as are employed in the ordinary course of water commerce, trade, and travel. See 56 Am. Jur., Waters, Sec. 179; *Insurance Co. v. Parmele, supra* (214 N.C. 63). Briefly stated, the rule with us "is that all water courses are regarded navigable in law that are navigable in fact." *Development Co. v. Parmele, supra* (235 N.C. 689).

It is noted that the record here presents no question as to conflict between riparian and navigation rights.

As to the defendant's plea of estoppel, it is enough to say that new facts alleged in the pleadings and developed at the trial relating to the *locus in quo,* showing that the instant case relates to only a small portion of the land involved in the former case, *Development Co. v. Parmele, supra* (235 N.C. 689), and that the land was purchased by the plaintiff after the passage of the Act, Chapter 966, Session Laws of 1953, validating titles to marsh land, prevent the plaintiff in this action from being estopped from asserting and proving marketable title to the *locus in quo.*

The judgment below will be upheld.

Affirmed.