LARRY CAPUNE v. JOHN S. ROBBINS, TRADING AS MOREHEAD OCEAN PIER.

(Filed 1 May 1968.)

1. State § 2—

Subject to the authority and rights of the United States respecting navigation, flood control and production of power, Congress has relinquished to the states the entire interest of the United States in all lands beneath navigable waters within state boundaries, inclusive of submerged lands within three geographical miles seaward from the coast of each state. 43 U.S.C.A. § 1311 *et seq.*

**2. Same—**

No submerged lands of the State may be conveyed in fee, but easements therein may be granted by the State in the manner prescribed by statute. G.S. 146-3, G.S. 146-12.

**3. Waters and Water Courses § 6—**

In the absence of any special legislation on the subject, a littoral proprietor and a riparian owner have a qualified property in the water frontage belonging by nature to their land, such property consisting chiefly of the right of access and the right to construct wharves, piers or landings.

**4. Same—**

The right of fishing in the navigable waters of the State belongs to the people in common.

**5. Same—**

The foreshore is that strip of land that lies between the high and low water marks and that is alternately wet and dry according to the flow of the tide.

**6. Same—**

Although the littoral owner has the right to construct a pier in order to provide access to ocean waters of greater depth, the owner may not lawfully prohibit the use of the ocean waters beneath his pier as a means of passage by water craft in a manner that involves no contact with the pier itself, nor may he unnecessarily obstruct the equal rights of the public to use the ocean waters seaward from the strip of land constituting the foreshore.

**7. Same; Assault and Battery § 3— Evidence in this action for civil assault held sufficient to warrant submission to the jury.**

Plaintiff's evidence tended to show that plaintiff, who was attempting a trip from New York to Florida down the Atlantic coastal waters on a paddleboard, approached defendant's fishing pier which extended one thousand feet into the Atlantic Ocean, that as plaintiff attempted to pass under the pier defendant yelled to plaintiff to turn back, and that defendant threw several bottles at plaintiff, one of which hit and injured him. *Held:* The evidence is sufficient to be submitted to the jury in plaintiff's action for civil assault, there being no evidence of any legal right of defendant to prohibit plaintiff from passing under the pier in continuation of his journey.

**8. Appeal and Error § 45—**

Exceptions not set out in appellant's brief are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

**9. Assault and Battery § 3—**

In an action to recover damages on account of an assault by defendant on plaintiff as the latter was attempting to pass under defendant's ocean pier, defendant's requested instruction that his action would not be wanton or reckless if he believed he was acting in an attempt to protect his property from a trespasser *is held* properly refused when the evidence is in-

sufficient to support a finding that plaintiff was a trespasser at the time he was struck and injured by defendant.

HUSKINS, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Bundy, J.,* January-February 1967 Civil Session of CARTERET, docketed and argued as No. 109 at Fall Term 1967.

Plaintiff instituted this civil action August 17, 1965, to recover $7,500.00 compensatory damages and $25,000.00 punitive damages on account of an alleged wilful, wanton, intentional and malicious assault by defendant on plaintiff. An order was then entered for the arrest of defendant as provided in G.S. Chapter 1, Article 34, "Arrest and Bail," upon failure to give bail in the amount of $10,000.00.

Uncontroverted evidence tends to show the facts narrated below.

Plaintiff, then about 22, was attempting a trip from Seagate, Coney Island, New York, to Florida, on an eighteen-foot-long paddleboard, without mast or sail. Plaintiff testified: "I would paddle it with my hands and steer with my feet. Paddling, I placed my arms in front of me and pulled down alongside the board. The total length of the trip I had planned was approximately 1,154 miles, paddling all the way." He came "down the entire coast on the paddleboard."

The trip was being covered by "Associated Press, United Press International, and television media, along with radio and local news coverage . . . plus coverage back on the West Coast" where plaintiff had completed a similar trip. Plaintiff testified that the publicity "enables me to make contracts with different sponsors." He testified further that, "in doing these trips I put myself as an endorser for various products that I use as you have seen with golf clubs, with baseball, that baseball players endorse. They get a certain percentage and this is what I hoped to achieve."

Plaintiff arrived at the Oceanana Motel on Atlantic Beach, N. C., on August 14, 1965, and spent the night there. The next morning, August 15th, he left the Oceanana about 9:00 o'clock a.m. on his paddleboard and "headed south under the Oceanana pier behind the surf line and . . . went under the next pier, which is Sportsmans' Pier." He then proceeded west and landed "near the Morehead Ocean pier," about two miles from the Oceanana pier. He intended to "go to the concession stand to buy something to eat and go to the rest room, . . ."

On August 15, 1965, defendant was the owner and operator of the Morehead Ocean Pier, on Bogue Banks in Carteret County. This pier, constructed pursuant to a permit issued by the U. S. Army Corps of Engineers on January 10, 1958, to Morehead Pier, Inc.,

from whom defendant purchased, extends out into the Atlantic Ocean for one thousand feet and is located approximately in the middle of the three hundred feet of water frontage land owned by defendant.

The pier, which is "about 20 feet above the water," was operated "for the purpose of sport fishing only." Defendant charged fishermen a fee of $1.00 a day to fish from the pier. On August 15th, a Sunday, there were "approximately 90 to 100 fishermen on the pier." Defendant operated "a concession stand and tackle shop" on the shore end of the pier. Nearby, on the shore, there was a picnic area. To avoid interference with the fishermen, defendant did not permit surf casting or bathing on his premises and undertook to prohibit boating and surfboarding in the waters 150 feet each side of the center of the pier. A sign facing those approaching from the road was in these words: "No soliciting and boats allowed on these premises." There was posted on each side of the pier a sign in these words: "No fishing or swimming near the pier."

Plaintiff and defendant were strangers. According to plaintiff's testimony, plaintiff approached defendant's premises from the ocean by paddleboard, his only means of travel, and was unaware of defendant's attempted restrictions on the use of the ocean waters alongside defendant's pier. According to defendant's testimony, defendant had no knowledge of plaintiff's sporting and publicity venture and assumed the paddleboard had been brought to his premises by land transportation.

Evidence, summarized except where quoted, tending to support plaintiff's allegations, is narrated below.

Upon landing on defendant's premises, plaintiff put his paddleboard on the sand and walked towards the pier. Defendant came running up, told plaintiff to leave, and to get his surfboard off defendant's property, and that "for many reasons he didn't allow surfboards around the fishing pier." Thereupon defendant went back "to his business" and out of plaintiff's sight. Plaintiff took his paddleboard "out in the ocean again, starting out a little bit to sea and . . . towards the middle of the pier." Plaintiff testified: "I saw there were a lot of fishermen on the end of the pier and didn't want to get in their way . . . I figured I would go through the center of the pier where there wasn't any or many fishermen and go on my way. . . . As I approached the pier, Mr. Robbins came running out on the pier, yelling and screaming, telling me not to go under the pier, so I stopped and said O.K., I'll go around it, and he threw a bottle at me and it came pretty close and I was trying to turn the board around to go around the pier. He told me not to go around, but to go back where I came from. I said I would, and then he threw

another bottle and I had to get off in the water; I was afraid. The only place I could hide was under the water to avoid being hit, and I asked him if I could come up and get the board and turn it around and leave, and as I got the board to turn around and leave (by turning it around I mean it was sort of broadside to the pier. It's a big board and you have to head it where you are going), and I started to paddle away from the pier to go around and he got me, hit me in the head with a third bottle. He hit me on the right side of my forehead." The next thing plaintiff remembered was that somebody pulled him out of the water and helped him get on his board and took him on his board to the shore. Thereafter he was taken to the Oceanana Motel and later to the hospital in Morehead City where "(i)t took approximately 24 sutures to close the wound" on his head. There was other testimony as to plaintiff's injuries. Too, there was testimony tending to show plaintiff suffered loss of income by being forced to give up his publicized venture.

Evidence offered by defendant, summarized except where quoted, tends to show the facts narrated below.

Defendant was at the tackle shop when he saw plaintiff standing "beside the boat" on defendant's property. Defendant, going down to the shore, told plaintiff: "Take your boat and get out of here; we don't allow them to operate this close to the pier and don't allow them on our property." Defendant then "rushed back" to the tackle shop. It was about fifteen or thirty minutes later when he next saw plaintiff. At that time, "(H)e (plaintiff) was on the paddleboard paddling out about 40 feet from the pier parallel with the pier going out from the shore and was about half-way out with regard to the pier about 400 feet, and he was on the east side of the pier about 40 feet away and he was paddling. . . . When I saw Capune out in the water as I have described, I went out on the pier and asked him to leave and asked him to turn away from the pier. When I saw Capune out in the water, I ran out on the pier and got almost straight in line with him, about 40 feet from him, and told him to turn away and leave. There were other people there. There were four or five fishermen standing there close by. When I told him to turn away from the pier, he turned towards the pier. I didn't hear him say anything. If he said anything to me, I didn't hear it. When he turned towards the pier, he started paddling and it looked like he was trying to go under the pier. There were fishermen there where he was trying to go under the pier. They had their lines in the water and were fishing. I told him three different times to turn away from the pier and leave. He paid no attention to it. I picked up a· pop

bottle beside the bench and threw it in his direction hoping that he would turn away. It hit the water about ten feet from the surfboard. He kept coming and I threw another one at him. Throwing the first two bottles had no effect on him whatsoever. I threw a third bottle at him and it hit him. I did not intend to hit him; I merely intended to frighten him to the extent that he would turn away from the pier. He fell off the surfboard. He and the surfboard separated. He was paddling around out in the water and a wave hit the board and one knocked it away from him and a fellow on the fishing pier who had a line that got tangled in the surfboard threw down his rod and reel and jumped overboard and swam to the surfboard, paddled out to Capune and both of them got on the board and came back to shore. Capune's head did not go under the water any time. He was on top of the water paddling."

The court submitted and the jury answered the following issues: "1.  Did the defendant John S. Robbins assault the plaintiff, as alleged in the Complaint? Answer: Yes. 2. What damages, if any, is the plaintiff entitled to recover from the defendant? Answer: $1,-000.00. 3. What amount of punitive damages, if any, is the plaintiff entitled to recover from the defendant? Answer: $10,000.00."

The court entered judgment which, after preliminary recitals and after setting forth said issues and the jury's answers, continued and concluded as follows:

"And it further appears to the Court, and the Court finding as a fact that the Complaint in this cause alleges a willful and malicious assault by the defendant upon the plaintiff such as to justify an Order for arrest;

"And it further appears to the Court, and the Court finding as a fact that an Order of arrest in this matter was issued on the 17th day of August, 1965, and that the defendant was arrested under arrest and bail proceedings in this cause as will appear of record;

"And it further appears to the Court, and the Court finding as a fact that, in lieu of furnishing bail by causing a written undertaking, payable to the plaintiff, to be executed by sufficient surety, as provided for by G.S. 1-420, the defendant and his wife, on the 18th day of August, 1965, gave bail by executing a deed of trust dated August 18, 1965, to A. H. James, Trustee for Larry Capune, in the amount of Ten Thousand ($10,000.00) Dollars conditioned as provided in G.S. 1-420;

"Now, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED that the plaintiff have and recover of the defendant the sum of Eleven

Thousand ($11,000.00) Dollars, together with the costs of this action."

Defendant excepted and appealed.

*Hamilton, Boshamer & Graham for plaintiff appellee.*
*Wheatly & Bennett for defendant appellant.*

BOBBITT, J. We consider first whether defendant had a legal right to forbid and prohibit plaintiff from passing under the pier on his paddleboard.

The Federal Statute, 33 U.S.C.A. § 403, relating to the obstruction of navigable waters, required that defendant's predecessor, before constructing a pier, obtain permission to do so from the U. S. Corps of Engineers. Otherwise, the issuance of the permit did not enlarge or impair defendant's littoral rights.

Subject to the authority and rights of the United States respecting navigation, flood control and production of power, Congress, by enactment of the Submerged Lands Act (1953), 43 U.S.C.A. § 1311 *et seq.*, relinquished to the states the entire interest of the United States in all lands beneath navigable waters within state boundaries, inclusive of submerged lands within three geographical miles seaward from the coast of each state. See *Bruton v. Enterprises, Inc.,* 273 N.C. 399, 160 S.E. 2d 482.

Our statutes, prior to enactment of Chapter 683, Session Laws of 1959, relating to "Lands Subject to Grant," were codified as Chapter 146, Article 1, of the General Statutes, recompiled 1952. Based on the statutes brought forward and codified in 1952 as G.S. 146-1 and G.S. 146-6, it was held that lands covered by navigable waters were not the subject of entry with one exception, to wit; Riparian owners were given a right of entry for the restricted purpose of using such lands for erecting wharves on the side of deep water in front of their shorelines. *R. R. v. Way,* 172 N.C. 774, 90 S.E. 937; *Land Co. v. Hotel,* 132 N.C. 517, 44 S.E. 39, and cases cited. Accord: *Barfoot v. Willis,* 178 N.C. 200, 100 S.E. 303. In *R. R. v. Way, supra,* Walker, J., for the Court, said that the State "granted merely a privilege or easement in the land and waters covered thereby, for the single purpose of building wharves in aid of commerce and a better enjoyment of the shores of navigable waters."

G.S. Chapter 146, as codified in 1952, was superseded by Chapter 683, Session Laws of 1959, which rewrote Chapter 146. G.S. 146-1 and G.S. 146-6 as codified in 1952 were repealed. Chapter 146, as rewritten in 1959, is now codified as Chapter 146 of Volume 3C of the General Statutes, 1964 Replacement.

G.S. 146-3, as now codified, provides that no submerged lands of the State may be conveyed in fee but that easements therein may be granted in the manner prescribed.

G.S. 146-12 provides:

"The Department of Administration may grant, to adjoining riparian owners, easements in lands covered by navigable waters or by the waters of any lake owned by the State for such purposes and upon such conditions as it may deem proper, with the approval of the Governor and Council of State. The Department may, with the approval of the Governor and Council of State, revoke any such easement upon the violation by the grantee or his assigns of the conditions upon which it was granted.

"Every such easement shall include only the front of the tract owned by the riparian owner to whom the easement is granted, shall extend no further than the deep water, and shall in no respect obstruct or impair navigation.

"When any such easement is granted in front of the lands of any incorporated town, the governing body of the town shall regulate the line on deep water to which wharves may be built."

Nothing in the record indicates an easement in the submerged land was granted to defendant or to any of his predecessors by the State. Absent such grant, his rights depend solely upon his status as a littoral or riparian owner.

In *Bond v. Wool*, 107 N.C. 139, 12 S.E. 281, involving a controversy between two riparian owners, neither had a grant for any of the property extending between the shore line and the channel, and each relied upon his rights as riparian owner. This Court, in opinion by Avery, J., said: "In the absence of any special legislation on the subject, a littoral proprietor and a riparian owner, as is universally conceded, have *a qualified property* in the water frontage belonging, by nature, to their land, the chief advantage growing out of the appurtenant estate in the submerged land being *the right of access* over an extension of their water fronts to natural water, and the right to construct wharves, piers, or landings, subject to such general rules and regulations as the Legislature, in the exercise of its powers, may prescribe for the protection of the public rights in rivers or navigable waters." (Our italics.) This statement is quoted with approval by Winborne, J. (later C.J.), in *O'Neal v. Rollinson*, 212 N.C. 83, 192 S.E. 688. Accord: *Gaither v. Hospital*, 235 N.C. 431, 70 S.E. 2d 680; *Jones v. Turlington*, 243 N.C. 681, 92 S.E. 2d 75.

In *Bell v. Smith*, 171 N.C. 116, 118, 87 S.E. 987, 989, where it was held that "(n)o person has a several or exclusive right of fishery

in any of the public navigable waters of the State," Clark, C.J., for the Court, said: "The right of fishing in the navigable waters of the State belongs to the people in common, to be exercised by them with due regard to the rights of each other, and cannot be reduced to exclusive or individual control either by grant or by long user by anyone at a given point."

The question arises as to whether the right of a littoral proprietor to construct a pier and thereby provide access to ocean waters of greater depth authorizes him to exclude the public from the use of the waters of the ocean under and along such pier. Although no decision of this Court bearing directly on the question has come to our attention, decisions of the Court of Appeals of New York relating to "(t)he strip of land that lies between the high and low water marks and that is alternately wet and dry according to the flow of the tide," known as the "foreshore," (Black's Law Dictionary, Fourth Edition, p. 777) bears significantly upon the question.

In *Barnes v. Midland Railroad Terminal Co.*, 218 N.Y. 91, 112 N.E. 926, the plaintiff sought to restrain the obstruction of part of the foreshore of Staten Island. On an earlier appeal, *Barnes v. Midland R. R. Terminal Co.*, 193 N.Y. 378, 85 N.E. 1093, 127 Am. St. Rep. 962, the relative rights of the littoral owner on the one hand and of the public on the other were defined. It was held that the littoral owner had the right to construct a pier in order to provide a means of passage from the upland to the sea; that the public must submit to any necessary interference to their right of passage over the foreshore, but that unnecessary obstruction was an invasion of the public right. In the later decision, where an injunction granted by the lower court was modified and affirmed, the court, in opinion by Cardozo, J., said: "If passage under the pier is free and substantially unobstructed over the entire width of the foreshore, the plaintiffs are entitled to no more. The pier was not built for their use, and is not to be maintained for their convenience. *Weems Steamboat Co. v. People's Steamboat Co.*, 214 U.S. 345, 29 S. Ct. 661, 53 L. Ed. 1024, 16 Am. Cas. 1222. But the passage under the pier must be free and substantially unobstructed over the entire width of the foreshore. This means that from high to low water mark it must be at such a height that the public will have no difficulty in walking under it when the tide is low or in going under it in boats when the tide is high." Accord: *Town of Brookhaven v. Smith*, 188 N.Y. 74, 80 N.E. 665, 9 L.R.A. (N.S.) 326; *Aquino v. Riegelman*, 104 Misc. Rep. 228, 171 N.Y.S. 716. It would seem the public would have equal rights to use without unnecessary obstruction the ocean waters seaward from the strip constituting the foreshore.

Conceding (1) defendant's ownership *of the pier* and *adjacent beach* and his right to prohibit the use *thereof* by others, and (2) that the use defendant was making of the pier and adjacent beach was lawful, it does not follow that defendant could lawfully prohibit the use of the ocean waters beneath the pier as a means of passage by water craft in a manner that involves no contact with the pier itself.

Here, evidence fails to disclose any legal right of defendant to forbid and prohibit plaintiff from passing under defendant's pier on his paddleboard in continuation of his journey to the south.

Defendant, by his failure to set them out in his brief, has abandoned, and properly so, his exceptions to the denial of his motions for judgment of nonsuit. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810. There was ample evidence to require submission to the jury of the issues raised by the pleadings. Moreover, there was no objection to trial on the issues as submitted by the court.

The assignments of error brought forward in defendant's brief, except formal assignments, relate to (1) asserted errors in the charge, and (2) asserted errors in rulings on evidence.

Defendant assigns as error excerpts from the charge in which the court defined "assault" and "assault and battery" and stated the contentions of plaintiff and of defendant with reference to the first issue. Considerations of these assignments fails to disclose error prejudicial to defendant. With reference to defendant's contentions, the court gave this instruction: "The defendant contends here that he did not assault the plaintiff; that he did not throw these bottles *at him* to strike him, but only *threw them into his vicinity* to scare him away where he was interfering with his business. Now, the Court instructs you that if he didn't throw them *at him,* then that would not constitute an assault, but if he threw them *at him,* then it would constitute an assault." (Our italics.) Although defendant excepted to this excerpt and assigned it as error, it seems clear the error was in defendant's favor.

With reference to the third (punitive damages) issue, the court gave appropriate instructions as to the nature of punitive damages and the circumstances under which punitive damages could be awarded. The only ground on which defendant challenges the two excerpts from the charge relating to this issue is that the court "failed to instruct the jury that if they found the defendant was acting in an attempt to protect his property from a trespasser under the belief it was necessary or reasonable, his action would not be wanton or reckless." Although the charge seems quite sufficient if plaintiff's

status were that of a trespasser, in the light of the legal principles set forth in the first portion of this opinion the evidence here is insufficient to support a finding that plaintiff was a trespasser on the occasion he was struck and injured by defendant.

The court permitted plaintiff's counsel, over defendant's objections, to cross-examine defendant as to whether he had assaulted other named persons on other specific but unrelated occasions. Clearly, the questions were permissible. Each was answered in the negative. Hence, defendant fails to show either error or prejudice in respect thereof.

Three persons who operated other fishing piers in the general area were offered as witnesses by defendant. Each testified, in accord with defendant's testimony, to the effect that activity such as swimming, surfboarding and boating in the ocean waters near a fishing pier seriously disturbed persons fishing from the pier and adversely affected the business of the operator thereof.

On cross-examination of one of these witnesses (Freeman), plaintiff's counsel was permitted, over defendant's objection, to ask: "(Y)ou never ran out on your pier and threw bottles and hit a man in the head with it, have you?" The witness answered: "No, sir." On cross-examination, plaintiff's counsel was permitted to ask, over defendant's objection, the second of these witnesses (Bradley): "You have never been out on your pier and thrown three bottles at some boy on a surfboard right under your pier, have you?" The witness answered: "No, sir." On cross-examination of the third of these witnesses (Snipes), the witness was permitted to testify without objection: "I have felt like throwing Coca-Cola bottles at people on surfboards, but I never have."

The thrust of the testimony of Freeman, Bradley and Snipes was in support of defendant's contention that activity such as that of plaintiff constituted a serious interference with the fishermen on defendant's pier and with defendant's business. The cross-examination tended to mitigate the impact of this testimony. Assuming, without deciding, that evidence responsive to the questions asked Freeman and Bradley was of doubtful relevance, the conclusion reached is that such evidence did not bear with sufficient significance on the outcome of the trial as to be deemed prejudicial to defendant. In our view, the assignments of error relating thereto are untenable.

Defendant having failed to show prejudicial error, the verdict and judgment of the court below will not be disturbed.

No error.

Huskins, J., took no part in the consideration or decision of this case.