CAROLINA BEACH FISHING PIER, INC. v. THE TOWN OF CAROLINA BEACH, NORTH CAROLINA

No. 18

(Filed 18 November 1970)

1. **State § 2; Waters and Watercourses § 7— property of the State — submerged coastal lands**

    The lands beneath coastal waters belong to the states and not to the federal government—subject, however, to the restrictions of the Commerce Clause and to specific reservations for use of such waters for navigation, flood control, or the production of power by the federal government.

2. **State § 2; Waters and Watercourses § 7— ownership of tidal lands and the foreshore**

    In North Carolina, private property ends at the high-water mark, and the foreshore is the property of the State.

3. **Waters and Watercourses § 7— high-water mark defined**

    The high-water mark is generally computed as a mean or average high tide and not as the extreme height of the water.

4. **State § 2; Waters and Watercourses § 7; Eminent Domain §2— title to seashore property — erosive action of the ocean — owner divested of title**

    A fishing pier operator whose seashore lots had been completely eroded by the Atlantic Ocean was not entitled to recover compensation from a municipality on the theory that the municipality's construction of a 15-foot beach erosion seawall constituted a taking of his lots for a public purpose without just compensation, where the

erosive action of the ocean had effectively divested the pier operator of his title prior to the construction of the seawall and had vested title in the municipality. 1963 Session Laws, Ch. 511.

**5. Constitutional Law § 6— legislative powers**

   The legislature has the power to abrogate, amend, or make exceptions to its own acts.

**6. Waters and Watercourses § 7; State § 2— title to submerged coastal lands — inconsistent statutes**

   Statute which granted municipality title in reclaimed seashore lands down to the *low-water* mark controls over inconsistent provision in another statute which provided that State land under navigable waters cannot be conveyed in fee. 1963 Session Laws, Ch. 511; G.S. 146-3(1).

**7. Pleadings § 37— issues raised by pleadings and evidence — submission to jury**

   Plaintiff's cause of action cannot be submitted to the jury on a theory of liability not supported by allegation and evidence; nor can plaintiff avail itself of evidence contrary to the allegations of its complaint.

**8. Eminent Domain § 13— action by fishing pier owner — municipal construction of beach seawall — evidence of damages**

   A fishing pier owner who sought compensation from a municipality on the theory that the municipality's construction of a beach erosion seawall constituted a taking of the lots on which the pier was located, *held* not entitled to offer evidence of the costs of a new ramp and of a 180-foot extension to the fishing pier.

APPEAL by plaintiff from *Cohoon, J.,* 16 December 1969 Civil Session of NEW HANOVER Superior Court.

Civil action to recover just compensation for the alleged taking of plaintiff's property for a public purpose without payment in violation of Article I, section 17, of the State Constitution and the Fourteenth Amendment to the Federal Constitution.

Plaintiff alleged and offered evidence tending to show that in December 1964 the Town of Carolina Beach authorized, approved and caused a berm or sand seawall to be built according to plans and under the supervision of the United States Army Corps of Engineers for the purpose of preventing or reducing erosion of the beach within the corporate limits of the town due to the forces of the sea, weather, hurricanes and storms; that the berm consisted of a wall of sand approximately fifteen feet high and running parallel to Carolina Beach Avenue (north) along the coastline with a 45-degree slope

out into the waters of the Atlantic Ocean; that plaintiff owned Lots 1 through 6 and Lot 9 in Block 216 as shown on the official map of Carolina Beach, and a fishing pier located thereon; that in the construction of the berm as aforesaid, plaintiff lost the use of same for the reason that the sand berm covered said lots and plaintiff is forbidden to construct or erect any structure over said areas covered by the berm and is forbidden to cross the berm except at designated crosswalks established by the Town of Carolina Beach, all of which results in a total loss of said lots and constitutes a complete taking of plaintiff's property for a public use without just compensation. (Plaintiff's allegations and evidence relating to damages will be noted in the opinion.)

Defendant filed answer in which it admitted that it built a berm or seawall, as alleged in the complaint, in the exercise of a governmental function and for a public purpose but denied all other material allegations of the complaint.

In its further answer and defense defendant averred, *inter alia,* that:

1. Over many years much of the land fronting on the Atlantic Ocean within the corporate limits of Carolina Beach had been washed away by successive storms, tides, winds and other natural forces. As a result, the Atlantic Ocean had moved westwardly for a great distance, especially along the northern end of Carolina Beach, and further erosion is threatened. By reason of such erosion and the westward movement of the Atlantic Ocean prior to the construction of the berm by the defendant, the eastern boundary of the lots described in plaintiff's complaint moved gradually westward until Lots 1 through 6 and Lot 9 of Block 216, as shown on the official map of Carolina Beach, were completely washed away and submerged by the waters of the Atlantic Ocean so that plaintiff's title to said lots had been divested by the ocean prior to the construction of the berm. If plaintiff ever had a valid claim to the ownership of said lots, defendant denies its claim.

2. All the land described in the complaint was formed by pumping sand from Myrtle Grove Sound and pushing up and hauling sand onto the beach and in that fashion restoring and filling in the shoreline of the Atlantic Ocean. By constructing the berm in this way, defendant replaced sand where it had been washed away and thereby created new land owned by the State of North Carolina.

3. On 22 May 1963 the General Assembly enacted Chapter 511 of the 1963 Session Laws entitled "An Act Relating to the Title to the Land Built Up and Constructed in the Town of Carolina Beach in the County of New Hanover as a Result of Certain Erosion Control Work in Said Town." Section 1 of said Act provides that so much of the lands filled in and restored which lie east of the "building line" (to be established as provided in said Act) is granted and conveyed in fee simple to the Town of Carolina Beach. All the land filled in and restored by defendant is east of said "building line" (shown on a map recorded in Map Book 8, page 52, of the New Hanover County Registry), and by virtue of said Act the land described in the complaint belongs to defendant.

The case was referred to the Honorable Joshua S. James by an order of compulsory reference to which all parties excepted and preserved a jury trial. The referee filed his report on 18 September 1967 in which he made findings of fact and concluded as a matter of law that plaintiff's action was barred by Section 3 of Chapter 511 of the 1963 Session Laws. The superior court affirmed and plaintiff appealed. We reversed and remanded to the Superior Court of New Hanover County, 274 N.C. 362, 163 S.E. 2d 363 (1968), with directions that the case be remanded to the referee to consider and answer the following issues: (1) Did the plaintiff own the property mentioned in the complaint at the time of the alleged taking? (2) Did the defendant take any of the plaintiff's property for a pubilc purpose? (3) What amount in compensation, if any, is the plaintiff entitled to receive from the defendant for such taking? In accordance therewith, the referee filed his report on 20 February 1969 in which he answered the first issue "Yes in part," the second issue "Yes" and the third issue "$5100." Defendant duly excepted to the referee's report and demanded a jury trial. The cause came on for hearing before Judge Cohoon and a jury. Defendant's motion for nonsuit at the close of plaintiff's evidence was allowed, and plaintiff appealed to the Court of Appeals. We allowed motion to bypass and the case is now before us again for appellate review.

*George Rountree, Jr. and John C. Wessell, Jr., attorneys for plaintiff appellant.*

*Addison Hewlett, Jr. and Hogue, Hill & Rowe, attorneys for defendant appellee.*

HUSKINS, Justice.

The first question for decision here is whether plaintiff's lots, or any portion thereof, were "taken" by the Town of Carolina Beach for the construction of the berm erected to control tidal erosion. Resolution of this problem requires a discussion of the general principles of ownership applicable to tidal lands.

[1] It has been settled since the passage of the Submerged Lands Act of 1953 by the United States Congress that the lands beneath coastal waters belong to the states, and not the federal government. "The seaward boundary of each original coastal state is approved and confirmed as a line three geographical miles distant from its coast line. . . . Nothing in this section is to be construed as questioning or in any manner prejudicing the existence of any State's seaward boundary beyond three geographical miles if it was so provided by its constitution or laws prior to or at the time such State became a member of the Union, or if it has been heretofore approved by Congress." 43 U.S.C. § 1312; 67 Stat. 31; *Bruton v. Enterprises, Inc.*, 273 N.C. 399, 160 S.E. 2d 482 (1968) ; *Capune v. Robbins*, 273 N.C. 581, 160 S.E. 2d 881 (1968). This concession is subject to specific reservations for use of such waters for navigation, flood control, or the production of power by the federal government. 43 U.S.C. § 1311; 67 Stat. 30. The authority of the State is further restricted by the Commerce Clause of the United States Constitution. "[T]he federal government, by virtue of its constitutional authority to regulate interstate and foreign commerce, has paramount power to control all navigable waters of the United States to the extent necessary for that purpose, and both the state and the riparian owners hold such waters and the lands under them subject to that power." Annotation, Rights to land created at water's edge by filling or dredging, 91 A.L.R. 2d 857 (1963). *See generally,* Aaron L. Shalowitz, Boundary Problems Raised by the Submerged Lands Act, 54 Colum. L. Rev. 1021 (1954). There is no ascertainable federal interest here, and we therefore direct our comments to the interests of the State and its property owners.

Where is the dividing line between the property of the State and that of the littoral private owner? There is a division among the States on that question, and the groups may be conveniently labeled "high-tide" states and "low-tide" states.

[2] The "strip of land between the high- and low-tide lines" is called the foreshore. 1 Powell on Real Property § 163; *Capune*

*v. Robbins, supra* (273 N.C. 581, 160 S.E. 2d 881). The high-tide states hold that private property ends at the high-water mark, and that the foreshore is the property of the state. The low-tide states, on the other hand, fix the boundary at the low-water mark, and the foreshore is said to belong to the littoral landowner unless it has been otherwise alienated. Powell on Real Property, *supra;* Annotation, *supra,* 91 A.L.R. 2d 857; 6 Thompson on Real Property § 3084 (1962); 56 Am. Jur., Waters § 458.

Although the North Carolina position is somewhat obscured by the vagaries of ancient cases, *see* David A. Rice, Estuarine Land of North Carolina: Legal Aspect of Ownership, Use and Control, 46 N.C.L. Rev. 779 (1968), North Carolina is a high-tide state. Under the old "entry and grant" statutes (which were replaced in 1959 by the State Land Act, Session Laws, 1959, c. 683, codified as Gen. Stat., c. 146), only land under non-navigable waters could be entered. Ownership which might interfere with navigation was not allowed. Therefore, littoral rights in ocean-front property did not include the title to the foreshore, which remained in the State. *McKenzie's Executors v. Hulet,* 4 N.C. 613 (1817); *Ward v. Willis,* 51 N.C. 183 (1858); *State v. Glen,* 52 N.C. 321 (1859); *Insurance Co. v. Parmele,* 215 N.C. 63, 197 S.E. 714 (1938); *Swan Island Club v. White,* 114 F. Supp. 95 (E.D.N.C. 1953); *Parmele v. Eaton,* 240 N.C. 539, 83 S.E. 2d 93 (1954); *Rice, supra,* p. 805; *Capune v. Robbins, supra.*

The State Land Act of 1959, *supra,* carries forward the distinction between navigable and non-navigable waters and provides that land under navigable waters cannot be "conveyed in fee," but that easements may be granted. G.S. 146-3. More importantly, the act creates a new subclassification for lands "which lie beneath . . . The Atlantic Ocean to a distance of three geographical miles seaward from the coastline of this State," and provides that no such lands can be "conveyed in fee." G.S. 146-3 and 146-64. There is nothing in the new act to change the general rule that ownership of the foreshore remains in the State. On the contrary, it is noteworthy that a special class was created for the protection of the foreshore and the marginal seas. We therefore adhere to our long established rule that littoral rights do not include ownership of the foreshore.

The littoral owner may, however, in exercise of his right of access, construct a pier in order to provide passage from the upland to the sea. " 'But the passage under the pier must be free and substantially unobstructed over the entire width of the foreshore. This means that from low to high water mark it must be at such a height that the public will have no difficulty in walking under it when the tide is low or in going under it in boats when the tide is high.' " *Capune v. Robbins, supra.* This language is consistent with the view we take here that the foreshore is reserved for the use of the public.

[3] Applying the foregoing principles, we hold that the seaward boundary of plaintiff's lots is fixed at the high-water mark. The high-water mark is generally computed as a mean or average high-tide, and not as the extreme height of the water. *People v. William Kent Estate Co.,* 242 Cal. App. 2d 156, 51 Cal. Rptr. 215 (1966) ; *Borax Consolidated, Ltd. v. Los Angeles,* 296 U.S. 10, 80 L. Ed. 9, 56 S. Ct. 23 (1935).

[4] Chapter 511 of the 1963 Session Laws relating to erosion control work in the Town of Carolina Beach was ratified 22 May 1963. Section 1 of the Act provides that so much of the lands to be filled in and restored which lie east of the "building line" (to be established as provided in said Act) is granted and conveyed in fee simple to the Town of Carolina Beach. Plaintiff's Exhibit "U" is a map of the "building line" established by the Town along the ocean front pursuant to said Act. This map, offered in evidence by plaintiff, shows that in January 1964 Lots 1 through 10 of Block 216 were completely submerged and the mean high-water mark of the Atlantic Ocean was in approximately the center of Carolina Beach Avenue north. The building line at this point was accordingly established along the western margin of Carolina Beach Avenue north. Thus, twelve months before the berm was built, plaintiff's lots had been taken by the sea and title thereto had vested in the State of North Carolina. This condition is confirmed by the following testimony of plaintiff's principal stockholder and witness Sam H. Blake: "By the fall of 1963 I had to extend the entrance of the ramp across the western side of Carolina Beach Avenue, and that was because one would have had to walk through water to get to the ramp at times. That street is approximately 40 feet wide, and our extension was 40 feet to the west in the fall of 1963, which was because the water had moved up into the street, but not all the time."

"It is a general rule that where the location of the margin or bed of a stream or other body of water which constitutes the boundary of a tract of land is gradually and imperceptibly changed or shifted by accretion, reliction, or erosion, the margin or bed of the stream or body, as so changed, remains the boundary line of the tract, which is extended or restricted accordingly. The owner of the riparian land thus . . . loses title to such portions as are so worn or washed away or encroached upon by the water." 56 Am. Jur., Waters § 477; *Jones v. Turlington,* 243 N.C. 681, 92 S.E. 2d 75 (1956). Thus the lots of the plaintiff were gradually worn away by the churning of the ocean on the shore and thereby lost. Its title was divested by "the sledge-hammering seas . . . the inscrutable tides of God." Herman Melville, *Moby Dick.*

[5, 6] G.S. 146-6, which governs the title to land raised from navigable waters, permits vesting of title to such lands in the littoral landowner (1) where he does the filling himself by permission of the State and under approved procedures or (2) where the purpose of the filling is "to reclaim lands theretofore lost to the owner by natural causes." G.S. 146-6(b), (c). Manifestly, the purpose here was the preservation and protection of the Town of Carolina Beach from the fury of the sea rather than the reclamation of the lands of private owners along the beach. Accordingly, we conclude that the purpose to be served by construction of the berm was not to reclaim lands theretofore lost to the owner by natural causes, and when Lots 1 through 6 and Lot 9 of Block 216 were raised above sea level by the sand berm title to the land so created which was located east of the building line vested in fee in the Town of Carolina Beach as provided in Chapter 511 of the 1963 Session Laws. This legislative grant to the Town of title to property east of the building line and extending to the *low water* mark of the Atlantic Ocean is inconsistent with G.S. 146-3(1). Even so, the 1963 Act repeals all laws in conflict with it and must be regarded as controlling in this instance. The Legislature has the power to abrogate, amend or make exceptions to its own acts. In this instance it has done so. Therefore, by virtue of Chapter 511 of the 1963 Session Laws, the Town of Carolina Beach owned the lots in question when the sand berm was built.

[7, 8] Plaintiff did not sue for damages to its fishing pier. Rather, plaintiff alleged that construction of the berm resulted in a total loss of the seven lots described in the complaint upon

which was located a commercial fishing pier extending into the Atlantic Ocean approximately 900 feet from the mean high water mark. Plaintiff sought recovery of $41,000 as the fair market value of said property at the time it was allegedly taken by defendant for a public purpose. Such is the theory of plaintiff's case, and it must be tried upon that theory. It cannot be submitted to the jury on a theory of liability not supported by allegation and evidence. *Moody v. Kersey,* 270 N.C. 614, 155 S.E. 2d 215 (1967); *Calloway v. Wyatt,* 246 N.C. 129, 97 S.E. 2d 881 (1957); *Herring v. Creech,* 241 N.C. 233, 84 S.E. 2d 886 (1954); *Morgan v. Oil Company,* 238 N.C. 185, 77 S.E. 2d 682 (1953). Plaintiff cannot avail itself of evidence contrary to the allegations of its complaint. *Davis v. Rigsby,* 261 N.C. 684, 136 S.E. 2d 33 (1964); *Watson v. Clutts,* 262 N.C. 153, 136 S.E. 2d 617 (1964); *Faison v. Trucking Co.,* 266 N.C. 383, 146 S.E. 2d 450 (1966). Thus the trial court properly rejected plaintiff's proffered evidence of the cost of a 180-foot extension to the fishing pier and the cost of replacing the ramp. That was not the theory of the case, and the complaint understandably contains no allegation which would render such evidence admissible. Had a taking been shown there was no competent evidence upon which the jury could have based its answer to the damages issue.

Plaintiff having failed to show either a taking or damages under applicable rules of law, the judgment of nonsuit is

Affirmed.