Courtney J. **MULLIN, Minnie Kelly Hunt, William G. Hunt, Warren D. Knapp, Cletus A. Waldmiller, Kathryn McCoy, Dailey Longwood Canady, Albert N. Wells, and Sunset Beach Taxpayers Association, Plaintiffs,**

v.

Samuel K. **SKINNER, Secretary of the United States Department of Transportation, Thomas D. Larson, Administrator of the Federal Highway Administration, The Federal Highway Administration, Thomas J. Harrelson, Secretary of the North Carolina Department of Transportation, William G. Marley, Jr., North Carolina State Highway Administrator, The North Carolina Department of Transportation, and The North Carolina Highway Administration, Defendants.**

**No. 90–547–CIV–5–BR.**

United States District Court, E.D. North Carolina, Raleigh Division.

Nov. 19, 1990.

James B. Maxwell, Ruth Ann McKinney, Maxwell & Hutson, Durham, N.C., for plaintiffs.

Eileen G. Coffey, U.S. Atty's. Office, Raleigh, N.C., for defendants.

## MEMORANDUM OPINION

BRITT, District Judge.

This is a suit for declaratory and injunctive relief arising out of the proposed construction of a high-rise, fixed-span bridge at the island of Sunset Beach, North Carolina. Plaintiffs are permanent residents of Sunset Beach, nonresident owners of property located in Sunset Beach, a commercial fisherman, and a nonprofit corporation consisting of 500 paid members who are both resident and nonresident landowners of property located in Sunset Beach. Defendants include state and federal officials and agencies responsible for this bridge project. Plaintiffs allege that defendants have violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4331 *et seq.*, the North Carolina State Environmental Policy Act ("SEPA"), N.C.Gen.Stat. §§ 113A–1 *et seq.*, and Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c). They seek to enjoin defendants from letting bids or proceeding with the financing, contracting, or construction of the proposed bridge until defendants have prepared and circulated a full environmental impact statement ("EIS") in accordance with NEPA and SEPA, and have fully complied with Section 4(f) of the Transportation Act. They also seek a declaration that all permits obtained in furtherance of this project are null and void. Defendants deny that they have violated any of these statutes and also argue that plaintiffs' complaint is barred by the equitable doctrine of laches.

The trial of this action commenced on 1 October 1990 and consumed nearly three

full days of the court's calendar. During the trial, 13 witnesses were called to testify and approximately 400 exhibits were entered into evidence. Additionally, the parties have submitted pretrial briefs, affidavits, post-trial briefs, and lengthy proposed findings of fact and conclusions of law. The court has considered the evidence and the submissions of the parties and now renders its decision. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion shall constitute the court's findings of fact and conclusions of law.

## I. FACTS

### A. Sunset Beach

Sunset Beach is a small barrier island located on the southernmost border of North Carolina, just north of North Myrtle Beach, South Carolina. It is approximately two miles long and a half-mile wide. The island consists of about 1250 platted lots, of which some 825 are already developed, 525 having been developed in the last 10 years. Each dwelling has its own septic tank, as there currently is no sewer system on the island. The island boasts only fifty permanent residents, though the summer seasonal population approaches 7,500. During the summer months the beach is also populated by daily visitors. Town zoning regulations impose a height limit of 35 feet and restrict development to single-family dwellings, except for ocean-front lots, where duplexes are permitted, and except for portions of the island that have instituted planned residential development (PRD), which has multi-family potential. The island is comprised of environmentally sensitive wetlands on the northern side and sandy beaches on the southern side. A variety of threatened and endangered species can be found at Sunset Beach and birdwatching is one of the principal recreational activities. The only commercial development consists of two small hotels, a grocery store, an arcade for children, a souvenir shop, an ice cream parlor, and a fishing pier and cafe. The Town of Sunset Beach was organized in 1963 by an act of the North Carolina General Assembly. Of the 1900 acres of land within the corporate limits, approximately 1400 acres consist of beaches, marshes, and waterways.

The island of Sunset Beach is separated from the mainland by a narrow portion of the Intercoastal Waterway and marshlands. These wetlands are crossed either by boat or via the existing one-lane, pontoon, swing-span bridge which was initially completed in 1961 and was most recently renovated in 1984. The bridge has been described as the only one of its type in North Carolina. It is 506 feet long and consists of a 115–foot movable span which includes 30–foot ramps at each end that fluctuate with the tides. The bridge has 18–foot wide approach spans and a 14–foot wide roadway on the movable span, which generally accommodates only one-way traffic. Traffic figures show that an average of 2000 vehicles per day crossed the bridge in 1984; an estimated 4700 will cross the bridge in 2006.

In a closed position, the pontoon bridge provides no vertical clearance for waterway traffic. When the movable span is opened to allow waterway traffic to pass, roadway traffic at either end of the bridge must wait several minutes until the span is back in place. In 1980 there were 6,522 bridge openings delaying 61,229 vehicles. Traffic lights at each end of the causeway leading to the moveable span control the safe movement of traffic across the bridge. When the bridge opens for boat traffic, vehicles are stopped on both sides by electronically controlled gates. The administrative record does not contain a single report of an automobile accident caused by the bridge, though a handful of boats have collided with the bridge over the years.

Just to the west of the island side of the bridge is a boat landing, where up to twenty vehicles can place boats into the water. It is accessible at both low and high tides and is the only one at Sunset Beach. Aside from this facility, the nearest public boat landing accessible to residents of Sunset Beach is located two beaches away at Holden Beach.

*B. History of the Bridge–Replacement Project*

*1. 1979–1981*

In 1979, the North Carolina Department of Transportation ("NCDOT") proposed to replace the pontoon bridge. Federal monies provided under the Federal–Aid Highways Act, 23 U.S.C. §§ 101 *et seq.,* were initially to constitute 75% of the funding, though that figure was later revised to 80%. In June 1979, NCDOT, United States Department of Transportation, and Federal Highway Administration ("FHWA") circulated a letter to various state and federal agencies soliciting comments on proposed alternatives then under consideration for the replacement bridge. The response from the National Marine Fisheries Service ("NMFS") stated that inadequate information was provided to make specific recommendations, but that, in any event, dredging and/or filling in wetlands in open waters should be avoided. The Natural Heritage Program within the North Carolina Division of Parks and Recreation recommended that a field study be conducted to determine the status of the American alligator, knobbed whelk, and venus' flytrap, endangered and threatened species known to exist on the island.

On 11 July 1979, a summer biological intern with the NCDOT prepared a thorough ecological assessment of the bridge replacement project. The assessment noted the presence of herons, storks, pelicans, ducks, geese, and other waterfowl nesting in the marshes along the coast of Sunset Beach. The assessment also addressed the inherent, aesthetic qualities at Sunset Beach:

Unlike most parcels of coastal land in North Carolina, the marshes have until recently been considered wastelands and have not been commercially developed. Thus these vast stretches of marsh grass with their large assemblage of wildlife still afford a rare and beautiful look at relatively unspoiled nature. North Carolina is one of the few eastern states blessed with large and numerous marshlands, and it is unquestionable that these valuable habitats are worth preserving

for future generations as an ecological, educational, and esthetically valuable resource.

The assessment also addressed the impact dredging would have on the environment at Sunset Beach:

Dredging an access canal along the proposed alignment for navigation purposes of floating construction equipment will result in some primary impacts. Canals of this type intercept and carry-off freshwater drainage to the bay, lower the water table in the immediate vicinity, create a need for disposal sites, and represent a loss of marsh habitat. From an ecological standpoint, this type of construction is considered the least desirable. . . .

On 2 October 1979, a public meeting was held at the Sunset Beach Town Hall to receive public comment. The NCDOT's news release announcing the meeting stated that "[o]f special concern is the environmental sensitivity of the area." Approximately 25 people attended the meeting. The most vocal support was for improvement of the existing bridge, rather than replacement. In response to comments from both state and federal agencies and the public, ten preliminary bridge designs were prepared and five were studied, ranging from low-level drawbridges to a high-level, fixed-span bridge. A "no-build" alternative was also considered.

On 11 October 1979, a sociologist at NCDOT analyzed the social impact of replacing the pontoon bridge with a high-level, fixed-span bridge:

The proposed action has been justified as a necessary action for several reasons: The present bridge structure is narrow, therefore, it poses a safety problem for vehicular traffic in the peak seasons of the year for beach traffic. Secondly, the present structure is somewhat low to the water, therefore the bridge must open in order to let certain kinds of boats through. This action impedes the flow of vehicular traffic and causes one to burn fuel that could be put to better use. In addition, emergency vehicles are

slowed down and made less efficient when they must stall for boat traffic.

The above are just a few barriers that are associated with the existing bridge structure. Improvement of this structure to wider widths and to higher elevation so that smaller watercraft can pass through without impeding the flow of vehicular traffic, and improved sight distances will prove to be socially advantageous to the general public, particularly to those residents who may rely more on emergency vehicles than those who are just passing through. So by and large, the proposed project is a positive one based on some of the above social implications.

This analysis was the only sociological assessment undertaken during the entire administrative process.

A second public meeting was held on 18 September 1980 and was attended by approximately 25 people. Minutes of the meeting show that there was vocal opposition to replacing the pontoon bridge. Citizens argued that 1) the existing bridge represents the lifestyle of people in Sunset Beach; 2) it has not caused any accidents; and 3) an expenditure of $6 million for 49 residents and vacationers could not be justified. Not long after this meeting, state and federal officials began to receive a steady barrage of letters from Sunset Beach residents, property owners, and vacationers, complaining that the replacement bridge was unnecessary and unwanted. Several stated that the bridge would ultimately result in increased development on the island, ruining its serene and natural environment. The letter-writing campaign continues to this day.

On 1 May 1981, NCDOT issued an internal report on the likely impact the proposed bridge would have on Sunset Beach's wetlands. One of the findings was that the most conspicuous inhabitants of the marshes are birds, including willets, yellow-legs, rails, ibises, egrets, herons, cranes, plovers, and various ducks, all of which use the marshlands as nesting sites. The report also stated that in response to the suggestion from the Natural Heritage Program, two field trips were made to the area by two biologists to attempt to locate the American alligator, knobbed whelk, and venus' flytrap. The report noted that none of these species were found in the areas being considered for the replacement bridge.

On 9 November 1981, a 43–page environmental assessment ("EA") was completed and circulated for interagency comments. The EA recommended "Alternate 1," a high-level, fixed-span bridge designed to provide a 65–foot vertical clearance over the mean high-water level allowing 100% of waterway traffic to pass at all times and providing for continuous vehicular traffic on a two-lane roadway. It stated that the existing bridge is "structurally, geometrically, and operationally obsolete." It described the purpose of the replacement project as replacing an obsolete bridge with one that will provide permanent, reliable access with improved traffic service and increased safety. The EA predicted that "[r]eplacement of the existing bridge with a more reliable modern structure may accelerate development somewhat on Sunset Beach. However, there will be no significant change in the ultimate development which is controlled by the size of the island and zoning ordinances." It also concluded that "[i]mproved accessibility to the project area will contribute to a positive social impact," that "[n]o division or disruption of an established neighborhood or community will result," and that "the overall scenic character will not be damaged by the project." Paragraph 7 of the EA's initial summary stated that

[p]lanning and environmental studies and comments received have shown that the proposed project is not expected to have significant adverse effects on the human or natural environment. Processing of an environmental impact statement should not be required based on the following conditions:

a. No substantial problems or objections have resulted from coordination with Federal, State, and local agencies.

b. The project is consistent with local and regional goals and objectives.

c. No Section 4(f) properties or historic structures are involved.

d. No significant impact on air or water quality is expected.

e. The project is not expected to cause significant alterations in land use, development patterns, or traffic volumes.

The EA also concluded that a replacement bridge would: 1) enhance economic and employment opportunities; 2) encourage tourism; 3) have a positive effect on property values and the local tax base; and 4) permit greater use of existing recreational areas. Additionally, it incorporated parts of the 1979 summer biological intern's ecological assessment, 1979 NCDOT sociologist's report, and 1981 NCDOT internal report, as well as synopses of interagency comments and the two public meetings.

On 10 December 1981, the United States Army Corps of Engineers ("Corps") responded to the EA by noting that the discussion of vegetation and wildlife was very general "and leaves the reviewer with little perspective for analysis." The Corps' response stated that "upland wildlife, the species group most affected by the project, is not discussed." The NMFS also found the EA inadequate:

In our opinion, the EA does not adequately address the indirect impacts (e.g., increased population causing increased pressure to fill wetlands for residential/recreational housing, increased volumes of domestic sewage adversely impacting shellfish) which may occur if improved access allows more individuals to use Sunset Beach for recreational purposes. Also, the methods which may be used for construction of the recommended project are not adequately addressed.... [O]ur concern is based on the fact that some construction techniques, such as canal dredging and the filling of wetlands for heavy equipment access, could adversely impact fishery resources.

Comments from other agencies did not raise concerns significant to this lawsuit.

### 2. 1982–1986

On 27 May 1982, a public hearing was held at Sunset Beach on the bridge-replacement project with 80 citizens in attendance. Five alternate designs of the new bridge were presented with Alternate 1—a highrise, fixed-span structure—as the recommended design. Eleven people spoke, of whom nine, including plaintiff Warren Knapp, opposed the project. Opposition was based on the perceived excessive cost of the bridge, the fear that the bridge would accelerate unwanted development on the island, and the fact that the present bridge, speakers argued, added to the natural charm of the island. At one point during the hearing the moderator asked if anyone was in favor of the project. There was initially no response. Finally, Edward Gore, the developer of Sunset Beach, a town councilman, and member of the Brunswick County Planning Board, came forward. He apologized to NCDOT "for the sentiment being expressed here, the patient telling the doctor how to treat us." He thanked the NCDOT staff for all of its efforts and told the "doctor [to] get on with the treatment." Written comments were also received from 147 citizens, of whom 75 were opposed to the project.

The 1982 public hearing gave NCDOT officials sufficient cause for concern to delay and restudy the bridge-replacement project. On 8 November 1982, NCDOT project engineer Tom Shearin authored a memorandum which recommended that renovation of the existing bridge be studied further as an alternative to building a new structure, in light of opposition to the project, its high cost, and relatively low traffic volumes involved. He concluded that construction of the new bridge should be delayed for approximately ten years. On 21 March 1983, NCDOT received a letter from Charlotte attorney John McIntosh, inquiring into the status of the project on behalf of a client. During a phone conversation the following day, Mr. McIntosh was told by a NCDOT official that the project was "on hold" pending a study to renovate the existing bridge. NCDOT completed that study on 20 September 1983, but took no further action at that time.

At about this same time, the Sunset Beach Taxpayers' Association ("SBTA") was formed for the purpose of facilitating orderly growth of Sunset Beach and pre-

serving its unique, unspoiled environment. One of its primary goals, then and now, is to act as a vehicle to oppose the construction of a new bridge at Sunset Beach. There are approximately 500 paid members in the association, most of whom own property in Sunset Beach and reside elsewhere. The SBTA has, since its inception, continuously and stridently opposed the replacement of the existing pontoon bridge through letter-writing campaigns to public officials, petition drives, and, most recently, the filing of this lawsuit.

After three years of "on hold" status, the bridge-replacement project was reactivated with a second public hearing on 25 June 1985. Five alternatives to replace the existing bridge were presented, with Alternate 1 again being the recommended design. Alternate 1 had been revised since the first public hearing, however, as the construction and development of a golf course on the mainland side in the interim necessitated design changes to avoid costly right-of-way expenses. The changes were made only on the mainland side of the proposed bridge and did not affect the design over the Intercoastal Waterway or on the island side.

Approximately 200 people attended the hearing. Eleven spoke in favor of the replacement project and 30 spoke against it, including plaintiffs Minnie Hunt, Warren Knapp, and the president of plaintiff SBTA, John McCarthy. Opponents of the project argued that the improved access provided by the high-rise bridge would accelerate growth and lead to high-density development that would alter the family-oriented lifestyle of their community. Ms. Hunt also alerted the gathering to the fact that the EA did not make any reference to relocation of the boat landing, which would be removed if the new bridge were built. Written comments from those who did not speak revealed 54 in favor and 82 against replacement, including plaintiffs Kathryn McCoy and William Hunt. In addition, a letter from the SBTA revealed that its membership had voted 119–1 against the new bridge at an open meeting held on 6 April 1985. Nonetheless, on 21 August 1985, NCDOT decided to proceed with re-

placement of the bridge. On 29 August 1985, the Sunset Beach Town Council unanimously adopted a resolution supporting replacement or improvement of the existing bridge.

On 9 December 1985, NCDOT and FHWA issued a Finding of No Significant Impact ("FONSI") stating that "this project will not have any significant impact on the human environment." The FONSI embraced Alternate 1 as revised prior to the second public hearing. This document addressed the NMFS's critique of the EA as follows:

> The project should create no significant increase in development pressure. Since the proposed replacement will be a two-lane facility, no significant increase in traffic volume over that which is using the bridge is likely. Development of the area and increased traffic will occur regardless of the type of bridge in place. This is evidenced by a 50 percent growth in traffic using the existing bridge in the last five years. Although there would no longer be a traffic delay due to the existing draw span, it is believed that induced development, if any, will be insignificant.
>
> Although no construction design plans have been prepared, it is anticipated that no construction canals will be necessary along the proposed alignment to facilitate movement of floating construction equipment.

To the Corps' critical evaluation of the EA, the FONSI stated:

> [M]uch of the upland vegetation in the study area has been disturbed by development. Recently, a golf course was constructed north of NC 179 in a tract of land dominated by sandy pine-oak woodland. What at one time was a continuous stand of trees valuable to area wildlife has been opened up and fragmented to the point that the area serves little value to area fauna.

The FONSI noted the local opposition to the project:

> Opponents of the proposed project want the existing bridge to be retained and improved as necessary to limit ac-

cess to the existing beach and thus preserve the "family" oriented and relaxed lifestyle. However, increased traffic and development of the area will occur regardless of the type of bridge in place.... Therefore, there is no reason to believe the existing bridge restricts access to the island to the point that a new bridge would increase visits. The existing bridge is not limiting access, and development is not being constrained. The future type and amount of development is controlled by the size of the island and local zoning ordinances.

Despite this paragraph, however, the FONSI did concede that "the proposed bridge may encourage more visits to the island...."

NCDOT gave final approval to the project on 16 January 1986. Nonetheless, as late as 5 March 1986, the FHWA responded to a letter from plaintiff Warren Knapp as follows:

You asked that the project be placed on temporary hold pending further investigation. Basically, the project is on hold, with the exception of the protective right-of-way acquisition. This acquisition is not a guarantee the project will be built, but rather a precaution in case it is. If the project is not built, the land can be disposed of in accordance with standard procedures. The delay in the project is a direct result of the strong opposition you and others have expressed and the fact that the projected service life of the present bridge is 10 years (to 1994).

### 3. 1987–present

On 24 February 1987, the FHWA authorized right-of-way acquisition to begin. The North Carolina Board of Transportation did likewise on 10 April 1987. On 29 June 1987, the FHWA approved preliminary plans for construction. However, the project was again delayed in October 1987 when NCDOT decided to relocate the Big Narrows Channel, located just west of Sunset Beach, in order to provide access for equipment necessary to construct the bridge. Relocating the channel will require the excavation or dredging of approximate-

ly 28,600 cubic yards of wetland. Despite the fact that the FONSI stated that no construction canals would be necessary for the project, NCDOT decided that its decision to dredge the Big Narrows Channel did not necessitate amending or modifying the FONSI. NCDOT decided to halt right-of-way acquisition pending preparation of new roadway plans to reflect this design alteration.

In the spring of 1988, applications were made to various state and federal permitting agencies. A section 401 water quality certification was issued by the North Carolina Division of Coastal Management on 24 October 1988. Noting that the current design called for elimination of the boat landing, however, the Division recommended to NCDOT that the current boat landing be replaced or maintained. A Coastal Area Management Agency (CAMA) permit was issued by the North Carolina Division of Environmental Management on 11 January 1989. NCDOT's applications to the Army Corps of Engineers for a section 404 permit to dredge and fill wetlands and to the United States Coast Guard for a bridge permit reiterated the FONSI's conclusion that the replacement project would not have a significant effect on the human environment. The Corps issued a section 404 permit on 31 January 1989. The Coast Guard, however, concerned about the elimination of the boat landing, suspended its consideration of NCDOT's application for a bridge permit until "this matter has been resolved." Its concern was predicated on letters received from plaintiffs Kathryn McCoy, Minnie Hunt, William Hunt, and Albert Wells, then president of the SBTA, all objecting to NCDOT's failure to provide for an alternate boat landing. In response to the Coast Guard's concern, NCDOT wrote the agency that

[t]he question of replacing this ramp came up in discussions with the Division of Coastal Management regarding our application for a CAMA permit. Our position with them, which is unchanged, was the area being used is an "unofficial" ramp that is in fact an allowed trespass. We do not believe the Department of Transportation has the responsi-

bility for replacing a ramp that is not a public ramp.

The Coast Guard finally issued the bridge permit on 5 May 1989. All four permits obtained by NCDOT contained provisions and conditions for environmental protection and mitigation of harm occasioned by construction.

In April 1989, the design of the bridge was again changed due to an increase in the traffic estimate for the year 2006. The bridge's width was increased from 28 feet to 30 feet to accommodate the larger traffic flow. NCDOT decided that this alteration did not necessitate any changes in the four permits it had obtained.

In July 1989, NCDOT contracted with an engineering firm to design the new bridge at a cost of approximately $350,000. In August 1989, right-of-way acquisition was completed, resulting in an expense of approximately $826,000. Between January and March 1990, discussions took place between Sunset Beach town officials and NCDOT and FHWA on allowing the town to use part of the right-of-way on the mainland side underneath the new bridge to construct a new boat ramp. However, no further action on this matter has been taken to date. On 5 March 1990, the Town, at the behest of councilman and developer Edward Gore, unanimously adopted a resolution urging that NCDOT engineers design the new bridge to allow for the attachment of water and sewer lines. On 26 March 1990 NCDOT decided that it would not be feasible to attach water and sewer lines to the structure. The Town therefore withdrew its request by resolution dated 2 April 1990.

On 21 August 1990, NCDOT advertised for bids to construct Alternate 1, the high-rise, fixed-span bridge, having received approval from the FHWA. This lawsuit was filed on 14 September 1990. On 17 September 1990, in lieu of a preliminary injunction, NCDOT and FHWA voluntarily agreed not to let the construction contract or begin construction until this court ruled on plaintiffs' complaint. On 18 September 1990, the bids were opened and the apparent low bid was $8,349,819.55, approximately $250,000 less than the next lowest bid.

## C. Plaintiffs' Evidence

During the three-day trial, plaintiffs adduced the testimony of several witnesses to challenge NCDOT's and FHWA's conclusion, as reached in the EA and FONSI, that the bridge-replacement project will not significantly affect the human environment. Dr. Orrin Pilkey, a geology professor at Duke University, testified that, in his expert opinion, the increased access provided by construction of the proposed bridge will increase the potential for intensified, high-rise, high-density development at Sunset Beach. He cited as examples of bridge-induced development the north end of Topsail, North Carolina and the west end of Bogue Banks, North Carolina, where extensive multi-family development did not occur until new bridges were installed. He stated that such development often leads to pollution of estuaries and sounds due to run-off from parking lots and poor handling of sewage. Dr. Pilkey strongly disagreed with the EA's and FONSI's conclusion that the bridge would not significantly affect the human environment.

David Brower, Associate Director of the Center for Urban and Regional Studies and a research professor in the Department of City Mutual Planning at the University of North Carolina at Chapel Hill, testified that there is a strong correlation between growth and development of an island and accessibility to the island. In his opinion, construction of the new bridge will increase the rate of development at Sunset Beach, increase the number of high-rise, multi-family developments and commercial facilities, and negatively affect the peaceful and natural character of the island. He stated that he could not conceive of any rational basis for the conclusion that the project will not significantly impact the human environment at Sunset Beach. He also explained that local zoning ordinances cannot be expected to control development following construction of a high-rise bridge, because political pressures inevitably develop to pass zoning ordinances allowing more,

and higher-density, residential and commercial development.

Robert Morris, a traffic engineer and transportation planner since 1957, testified that the EA's conclusion that the bridge will not cause significant alterations in traffic volumes is incorrect. He stated that improvements in transportation accessibility always result in generated traffic—traffic which takes place solely because of the improvements. He stated that the EA, in predicting enhanced economic and employment opportunities, increased tourism, greater use of recreational areas, and more visits to the island, implicitly acknowledged the traffic which will be generated by the new bridge. In his view, the island would see increased permanent development as the result of improved access, and NCDOT's conclusion that the new bridge would not cause significant increases in traffic and induced development does not make sense.

Phillip Rea, professor and head of the Department of Parks, Recreation and Tourism Management at North Carolina State University, testified that in his professional opinion recreational uses of the island would be negatively impacted if development increased significantly. While visiting Sunset Beach, he has observed recreational walking, jogging, and bicycling. He stated that naturalists have an opportunity to birdwatch, collect shells, and study sea turtles in a manner which would not be possible in a more highly developed area. Professor Rea was of the opinion that boating would be adversely affected by construction of the proposed bridge due to the loss of the existing boat ramp. He stated that the existing bridge itself was a critical component of the "mindset recreation" at Sunset Beach. He criticized the EA for ignoring the value of the existing bridge as a cultural resource and ignoring the social impact the proposed bridge will have on the Sunset Beach community.

Dr. Charles Cole, also with the Department of Parks, Recreation, and Tourism Management at North Carolina State University, testified that based on his extensive studies at Cape Hatteras and Nags Head, North Carolina, he has concluded that septic systems are inadequate to accomodate waste water emanating from high-density populations. It is his opinion that increased development at Sunset Beach, which he characterizes as medium density, will put a strain on the Town's filter system such that water quality will eventually deteriorate. He also predicted that NCDOT's efforts to mitigate wetland damage caused by dredging the Big Narrows Channel would probably not be successful.

Harry E. LeGrand, Jr., a zoologist at the North Carolina Natural Heritage Program, who tracks threatened and endangered species, testified that 20 to 30 wood storks, which became a federally endangered species in 1984, have inhabited the fresh water ponds and salt marshes at Sunset Beach each summer for at least 20 years. He testified that one or two pairs of the piping plover, a federally threatened species since 1985, have regularly nested at Sunset Beach during the 1980s. They breed on the sandy beaches.

Thomas Henson, the coastal non-game endangered wildlife project leader for the North Carolina Wildlife Resources Commission, testified that loggerhead sea turtles, a federally endangered species since 1978, have nested on the beach at Sunset Beach for some time. He testified that the nests can be found on the entire length of the beach and that this year 17 nests were spotted averaging 120 turtles per nest. Mr. Henson stated that increased development at Sunset Beach would affect the loggerhead turtle in three ways: 1) many of the females would be dissuaded from nesting on the beach; 2) people would step on and destroy the eggs; and 3) the hatchlings would become disoriented because of increased lighting, and would make their dash for the ocean in the wrong direction.

Plaintiff Kathryn McCoy testified that she has observed loggerhead sea turtles at Sunset Beach since 1959, the wood stork roosting in lakes and feeding on the causeway on both sides of the existing bridge since 1974, the piping plover on the beach by the inlets at least since 1979, and the sea beach amaranth, a flowering plant and

a state threatened species since 1977, near the base of the dunes at Sunset Beach, for the last six to eight years.

Plaintiff Minnie Hunt testified that the only indication she had between 1985 and 1989 that the bridge was actually going to be built was NCDOT's 1988 request for a CAMA permit. She stated that the first time she knew for sure that the bridge was going to be built was when NCDOT announced in August 1990 that bids would be accepted on the project.

### D. Defendants' Evidence

Defendants' evidence consisted of the testimony of four state and federal officials involved in the bridge-replacement project and the state and federal administrative records. The testimony adduced at trial consisted largely of the officials' explanation of the documents contained in the administrative records, which were summarized in detail in section I.B. of this order. Boiled down to its core, defendants' testimony consisted of three primary points: 1) development will occur at Sunset Beach regardless of whether the proposed bridge is built; 2) any development induced by the increased access associated with the new bridge will be insignificant; and 3) significant changes in development patterns can be brought about only through zoning changes enacted by local officials, not by the building of a bridge by NCDOT.

## II. DISCUSSION

### A. Laches

This court will first consider defendants' argument that plaintiffs' complaint is barred by laches, for if it is, a discussion of the merits of plaintiffs' claims is unnecessary. Defendants argue that plaintiffs' action should be barred because plaintiffs unreasonably delayed filing suit and have allowed critical stages in the project to pass without raising objections. They contend that they have been seriously prejudiced by plaintiffs' delay, as they have already completed the design of the bridge, acquired the right-of-way, and advertised the construction contract. Right-of-way acquisition cost $826,000 and design costs were approximately $350,000. Defendants also contend that they might be further prejudiced because they might lose the lowest qualified bid which is approximately $1,000,000 below their own estimates.

The doctrine of laches is applicable to environmental causes of action. *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860, 867 (5th Cir.1975). Three independent criteria must be met before the doctrine can be applied. Defendants must show: 1) delay in asserting a right or claim; 2) that the delay was not excusable; and 3) that they suffered undue prejudice from the delay. *Id.* There is no question that plaintiffs delayed in bringing this action—they could have brought it in 1981 following dissemination of the EA or in 1985 following dissemination of the FONSI. The delay, however, was excusable. In fact, defendants themselves contributed greatly to the delay. It must be remembered that defendants placed the bridge-replacement project "on hold" not long after the EA was released. Indeed, it appears that legal action was contemplated by a Sunset Beach property owner as early as March 1983, when NCDOT informed a Charlotte attorney that the project was "on hold." As late as March 1986 plaintiff Warren Knapp was informed by the FHWA that the project was on hold due in part to the fact that the existing bridge would last until 1994. Plaintiffs cannot be blamed for their delay in bringing this action.

Defendants cite the case of *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) for the proposition that plaintiffs pursuing environmental actions must meaningfully involve themselves in the administrative process before proceeding with legal action. That case, however, has nothing to do with the doctrine of laches, and by no means suggests that plaintiffs who fail to involve themselves in administrative proceedings prior to filing suit should be barred from proceeding with their claims. *See id.* at 553, 98 S.Ct. at 1216–17. None-

theless, assuming *arguendo* that *Vermont Yankee* can be interpreted as defendants desire, plaintiffs would still not be barred from proceeding with this action. At the 1982 public hearing, plaintiff Warren Knapp expressed his opposition to the high-rise, fixed-span bridge. As a result of his input and that of others opposed to the new bridge, the replacement project was delayed for over three years. At the 1985 public hearing, plaintiffs Warren Knapp and Minnie Hunt spoke against the project, as did the president of the SBTA; plaintiffs Kathryn McCoy and William Hunt wrote letters opposing the project. In the permitting process in 1988, plaintiffs Minnie Hunt, Kathryn McCoy, William Hunt, and Albert Wells each wrote to the Coast Guard complaining of the elimination of the boat landing, actually causing a delay in NCDOT's acquisition of a bridge permit. In short, it cannot be said that plaintiffs failed to meaningfully involve themselves in the administrative proceedings prior to filing suit. In fact, just the opposite appears to be true.

■ Even if plaintiffs' delay in bringing suit were inexcusable, defendants' claim of laches would be unsuccessful because they have failed to demonstrate the prejudice necessary to establish this defense. In addressing the element of prejudice, the court must determine whether the project has "progressed to the point where the costs of altering or abandoning [it] would *certainly* outweigh the benefits that might accrue therefrom to the general public." *Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323, 1330 (4th Cir.) (emphasis in original), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972). The public interest is relevant to a determination as to prejudice because "the prejudice to the defendant[s] lies not merely in [their] actual expenditures or even in [their] claimed detriment, but rather in what Congress defines as prejudice." *Ecology Center*, 515 F.2d at 868. Under NEPA, Congress has charged NCDOT and FHWA with considering not just the transportation needs of Sunset Beach, but its environmental needs as well. *See id.* "Laches must be invoked sparingly in environmental cases because

ordinarily the plaintiff will not be the only victim of alleged environmental damage. A less grudging application of the doctrine might defeat Congress's environmental policy." *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir.1982).

■ Thus, the amount of time and resources already committed to a project has to reach a very high level before a court can properly invoke the doctrine of laches. In *Arlington Coalition*, 93.9% of all dwellings, 98.5% of all businesses, and 84.4% of all right-of-way had been acquired, the engineering report had been completed, over $30 million had been expended, and minimal construction on the project had begun. 458 F.2d at 1328. The court "decline[d] to invoke laches against appellants because of the public interest status accorded ecology preservation by the Congress." 458 F.2d at 1329 (footnote omitted) *But cf. Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75 (4th Cir.1989) (balance of harms in preliminary injunction analysis weighed in favor of defendants who had spent more than $7 million constructing and planning highway). *See also Preservation Coalition*, 667 F.2d at 855 (four square blocks leveled, but no construction begun—laches not employed); *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 779–80 (9th Cir.1980) (right-of-way acquisition complete; utilities relocated; 92 acres of timber cleared; $1,000,000 expended—laches not employed); *City of Davis v. Coleman*, 521 F.2d 661, 670 n. 11 (9th Cir.1975) (50% of interchange completed—laches not employed); *Ecology Center*, 515 F.2d at 869 ($1,000,000 spent on right-of-way acquisition—laches not employed); *Steubing v. Brinegar*, 511 F.2d 489, 493–95 (2d Cir.1975) ($4.7 million spent on construction of expressway bridge—laches not employed); *College Gardens Civic Ass'n v. United States Dep't of Transp.*, 522 F.Supp. 377, 380, 382–83 (D.Md.1981) (construction begun on railroad bridge above project road—laches not employed); *Ward v. Ackroyd*, 344 F.Supp. 1202, 1212–13 (D.Md.1972) (right-of-way acquisition complete; $16,400,000 expended—laches not employed); *Natural Resources Defense*

*Council, Inc. v. Grant,* 341 F.Supp. 356, 363, 368 (E.D.N.C.1972) (easements and right-of-way obtained; over $200,000 expended—laches not employed). *But see Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 480–81 (5th Cir.) ($176–$286 million expended and much of waterway constructed—laches employed), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980); *Save Our Wetlands, Inc. v. United States Army Corps of Engineers,* 549 F.2d 1021, 1028–29 (5th Cir.) (over $26,000,000 expended and construction substantially complete—laches employed), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *City of Rochester v. United States Postal Service,* 541 F.2d 967, 977 (2d Cir.1976) (construction of postal facility 35% complete—laches employed); *Daingerfield Island Protective Soc'y v. Hodel,* 710 F.Supp. 368, 375 (D.D.C.1989) (construction not yet begun, but sensitive wetlands acquired and maintained for 18 years by government in connection with project—laches employed); *Stow v. United States on Behalf of Soil Conservation Serv. of the United States Dep't of Agric.,* 696 F.Supp. 857, 863 (W.D.N.Y. 1988) (construction of dam 31% complete; relocation work 49% complete; $1.5 million expended—laches employed). As these cases make clear, if plaintiffs bring suit prior to substantial construction of the proposed project, sufficient prejudice does not ordinarily exist to warrant the imposition of laches, even though expenditures have been great. Plaintiffs here have brought suit prior to any construction of the proposed high-rise bridge. Defendants therefore have not been prejudiced by plaintiffs' delay to the extent that laches should apply.

Despite all of the case law on point, defendants cite only *Sierra Club v. Hassell,* 503 F.Supp. 552 (S.D.Ala.), *aff'd,* 636 F.2d 1095 (5th Cir.1980) in support of their claim that laches bars plaintiffs' action. There the district court, in the last three paragraphs of a 63–paragraph decision, stated that the doctrine would have applied had it not found plaintiffs' substantive allegations without merit. *Id.* at 564. It noted in these paragraphs that five critical dates

passed within a six-month period without plaintiffs bringing suit and that substantial expenditures had already been made on the bridge-replacement project at issue. *Id.* The court of appeals did not even address that portion of the district court's decision in its opinion. Thus, the one case defendants point this court to on the doctrine of laches did not even result in its application. Defendants' argument here will not either.

## B. NEPA

### 1. Definitions

■ NEPA requires preparation of a detailed EIS for all major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Regulations promulgated by the Council on Environmental Quality ("CEQ") define the significant words and phrases of this statute. "Major federal actions" are those which are subject to federal control and responsibility. 40 C.F.R. § 1508.18 (1989). They include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." *Id.* § 1508.18(a). Defendants do not dispute the fact that the federal funding component (80%) of the bridge-replacement project makes it a "major federal action."

Actions can "affect" the human environment both directly and indirectly. *Id.* § 1508.8. Indirect effects are later in time or removed in distance from the challenged action, but are reasonably foreseeable. *Id.* § 1508.8(b). They "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.* Effects include "aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.*

The " 'human environment' shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment." *Id.* § 1508.14. "Economic or social effects are not intended by themselves to require

preparation of an environmental impact statement." *Id.* "Significantly" as used in the statute "requires considerations of both context and intensity." *Id.* § 1508.27. "Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant." *Id.* § 1508.27(a). Intensity "refers to the severity of the impact." The CEQ regulations set out 10 factors that should be considered in evaluating intensity:

(1) Impacts may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historic resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*Id.* § 1508.27(b). The FHWA has its own set of regulations to follow in addition to the CEQ regulations. *See* 23 C.F.R. §§ 771 *et seq.* (1990).

### 2. Plaintiffs' Argument

Defendants did not prepare an EIS, having concluded in both the EA and FONSI that the bridge-replacement project would not significantly affect the quality of the human environment. Plaintiffs challenge that conclusion and argue that the improved access provided by the high-rise bridge will cause significant indirect impacts on the human environment. Their argument hinges on a prediction that the new bridge will induce high-density development at Sunset Beach which, in turn, will result in a variety of impacts on the human environment: 1) water pollution caused by increased runoff and strain on the existing septic tank system; 2) increased vehicle traffic and congestion; 3) a radical social change on the island due to a massive increase in population; 4) loss of the opportunity to engage in natural forms of recreation such as birdwatching; and 5) further endangerment of the wood stork, piping plover, loggerhead turtle, and sea beach amaranth. In addition, plaintiffs argue that the bridge-replacement project will have two significant direct impacts on the human environment: 1) the elimination of the boat landing thereby negatively affecting the ability of residents and visitors to engage in boating; and 2) elimination of wetlands, and its concomitant effect on water organisms and species, via the dredging of the Big Narrows Channel. In light of all of these effects on the human environment, plaintiffs argue, defendants must be compelled to prepare a full EIS and should be enjoined from going any further on the project until one is prepared.

### 3. Standard of Review

■ In reviewing defendants' decision not to prepare an EIS, this court's sole function is to determine if their decision was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A) (Administrative Procedure Act)); *Coalition for Responsible Regional Dev. v. Coleman,* 555 F.2d 398, 399 (4th Cir.1977). Under this deferential standard of review, a court can disturb an agency's decision only if it was not based on relevant factors or was a clear error of judgment. *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24; *Coleman,* 555 F.2d at 400 n. 6. A decision is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

■ In reviewing an agency decision under NEPA, the court is to ensure that the agency has taken a "hard look" at the environmental consequences of the proposed action. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976); *Coleman,* 555 F.2d at 400. The court cannot " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " *Kleppe,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21 (quoting *Natural Resources Defense Council v. Morton,* 458 F.2d 827, 838 (D.C.Cir.1972)). Rather, the court must " 'engage in a substantial inquiry' in order to determine whether the agency, in its conclusions, made a good faith judgment, after considering all relevant factors, including possible alternative or mitigative measures." *Coleman,* 555 F.2d at 400 (quoting *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823).

### 4. Analysis of Agency Action

Paragraph 7 of the EA states that the bridge-replacement project will not have a significant effect on the human environment, and that an EIS is therefore unnecessary. This conclusion was predicated on five reasons: a) no substantial objections were raised by federal, state, or local agencies; b) the project was considered consistent with local and regional objectives; c) it was determined that no Section 4(f) properties are involved; d) no significant impact on air or water quality was anticipated; and e) it was concluded that the project will not cause significant alterations in land use, development patterns, or traffic volumes. The court will now analyze these determinations in an attempt to assess whether they resulted from a "clear error of judgment." *Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823.

As to the latter two determinations, the court is instructed by the case of *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975), which is almost directly on point. That case involved proposed construction of a highway interchange in an agricultural area of California known as Kidwell. The project was necessitated by the difficulty and inconvenience of traveling from the Kidwell area to Davis, California and other points north and east. *Id.* at 666–67. The project would have connected the Kidwell area with Interstate 80, thereby allowing direct access to points north and east. *Id.* at 667. Plaintiffs moved to enjoin construction, then already underway, based on the failure of the FHWA and relevant state agency to prepare an EIS. They argued that the new interchange would induce massive commercial development thereby resulting in water pollution, a large increase in population, and expanded residential development in the Kidwell area. *Id.* at 675. Their argument had solid foundation, as future industrial development had already been planned for the Kidwell area by Solano County, California and the

**920**

City of Dixon, though the entire area was then zoned as agricultural. *Id.* at 667.

Rather than preparing an EIS, the state agency in charge of the project prepared a "Negative Declaration of Environmental Impact." This document stated that the purpose of the project was to "relieve congestion, provide better traffic service and a safer facility by eliminating at-grade intersections and expanding the lateral clearances." *Id.* at 669 n. 8. It concluded that the proposed interchange "is not considered to have a significant effect upon the environment...." *Id.* Although the district court upheld the agency decision not to prepare an EIS, the court of appeals reversed. *Id.* at 682. Its analysis is instructive:

Regardless of the weight accorded to the expert opinions and supporting data submitted by [plaintiff], it is obvious that constructing a large interchange on a major interstate highway in an agricultural area where no connecting road currently exists will have a substantial impact on a number of environmental factors. That this is so is recognized in the Department of Transportation's own PPM 90–1, August 24, 1971, 2 Env.L. Rep. 46106, which governs preparation of impact statements for federal-aid highway projects:

The improved access and transportation afforded by a highway may generate other related actions that could reach major proportion and which would be difficult to rescind. *An example would be a highway improvement which provides access to a non-accessible area, acting as a catalyst for industrial, commercial, or residential development of the area. Id.,* Appendix E, Par. 2f, 2 Env.L.Rep. at 46110.

The growth-inducing effects of the Kidwell Interchange project are its reason d'etre, and with growth will come growth's problems: increased population, increased traffic, increased pollution....

*Id.* at 674–75 (emphasis added).

The court quoted from an annual report of the CEQ that a highway project may " 'induce residential and industrial growth,

which may in turn create substantial pressures on available water supplies, sewage treatment facilities, and so forth. For many projects, these secondary or induced effects may be more significant than the project's primary effects.' " *Id.* at 676–77 (quoting *Fifth Annual Report of the Council on Environmental Quality* 410–11 (December 1974)). The court concluded that

currently available information and plain common sense indicate that it was hardly "reasonable" for [defendants] to conclude, without further study, that the environmental impact of the proposed interchange will be insignificant. We think this is precisely the kind of situation Congress had in mind when it enacted NEPA: substantial questions have been raised about the environmental consequences of federal action, and the responsible agencies should not be allowed to proceed with the proposed action in ignorance of what those consequences will be. NEPA ... require[s] that the interchange's environmental impact be studied and analyzed in good faith before [defendants] decide whether the project is to be completed as planned, or to be modified or abandoned. [Plaintiffs] ha[ve] raised disturbing questions. It is now up to the defendants to answer those questions.

*Id.* at 675–76 (footnote omitted). The court remanded to the district court with instructions to enjoin further activity on the project pending preparation of an EIS. *Id.* at 682.

It is true that there are at least two distinctions between *Davis* and the instant case: 1) in *Davis,* new development at the proposed project site was already in the planning stage at the time the environmental document was prepared, whereas at Sunset Beach it was not, and 2) in *Davis* the project itself provided completely new access, rather than the merely improved access to be provided to Sunset Beach. Nonetheless, the similarities between the cases compel a like conclusion. Just as it was common sense that the increased access provided by the proposed interchange in *Davis* would spur development, it is also

common sense that the proposed high-rise bridge, and the increased access it will bring, will spur development at Sunset Beach. As demonstrated convincingly by plaintiffs' expert witnesses, the contrary conclusion reached by NCDOT and FHWA cannot be supported by human experience or any reasonable application of known social, scientific, developmental, and traffic engineering principles. It is an irrefutable reality that the easier it is to get somewhere, the more people will be inspired to do so. This seems particularly true with respect to North Carolina beaches, which have been massively developed following highway improvements such as the one at issue here. Although no new development has yet been planned at Sunset Beach as the result of the proposed high-rise bridge, the examples set by North Topsail Beach and the west end of Bogue Banks portends large-scale future development if the bridge becomes a reality.

In defense of their decision that the new bridge will not spur significant increased development at Sunset Beach, defendants, in the EA, FONSI, and at trial, have raised three points: 1) development will occur at Sunset Beach regardless of whether the proposed bridge is built; 2) any development induced by the increased access will be insignificant; and 3) significant changes in development patterns can be brought about only through zoning changes, and not by the construction of a high-rise bridge. As to their first two points, defendants argue that the increase in the number of residences at Sunset Beach in the last decade from 300 to 825 suggests that development is already occurring rapidly despite the existing bridge, and that therefore any increase in development induced by the bridge cannot be considered significant. However, as there are only 1,250 platted lots on the entire island, any further development of single-family residences will, of necessity, be quite minimal. In contrast, if the bridge is built, the court finds that what is likely to happen is that single-family dwellings will be torn down and replaced with multi-family structures. This would indeed constitute a significant increase in development, unlike that which has occurred until now.

Defendants' third point is so utterly devoid of common sense and inconsistent with NEPA that it cannot be taken seriously. This court did not need plaintiffs' experts to tell it that zoning changes inevitably follow development pressures. To believe otherwise is to ignore reality. More importantly, defendants' argument that it is these zoning changes which will cause increased development, and not the bridge, completely ignores the regulatory definition of "indirect effects" which they are required to abide by: indirect effects are those "which are caused later in time ... [and] may include growth inducing effects...." 40 C.F.R. § 1508.8(b); see Davis, 521 F.2d at 674–77. Even though zoning changes may be necessary to alter existing uses of land, if a major federal action makes it likely that such changes will occur, the action will have an indirect effect on the environment. See, e.g., Davis, 521 F.2d 661.

Ironically, the EA itself implicitly concluded that land use, development, and traffic will be significantly altered by the new bridge. The EA predicted 1) enhanced economic and employment opportunities, 2) increased tourism, 3) greater usage of existing recreational areas, and 4) increased property values and tax base. These predictions simply cannot be squared with the conclusion that land use, development, and traffic will not be significantly altered by the new bridge. Further, the EA does not address the adverse consequences high-density development is sure to bring about, such as increased population, increased pollution, and increased traffic, the same type of impacts which the National Marine Fisheries Service indicated would have to be addressed before the EA could be considered adequate, and the identical impacts the Davis court found would naturally result from increased development. In short, the final two determinations of paragraph 7 suffer from a "clear error of judgment." Overton Park, 401 U.S. at 416, 91 S.Ct. at 823–24; Coleman, 555 F.2d at 400 n. 6.

Two of the other three determinations in paragraph 7 used to support the decision not to prepare an EIS also suffer from a clear error of judgment. At the time the EA was prepared, it was obvious that the high-rise bridge and development it will induce were not consistent with local and regional goals. In a local survey of property owners which was included in the 1980 Land Use Plan, 90% of the property owners on the island stated that they had chosen Sunset Beach as a place to live or invest because it is a "family beach" and 73% of the island property owners and 86% of the mainland property owners indicated that they had chosen the town because it is a "quiet community." In contrast, only 9% of the mainland property owners and 20% of the island property owners indicated that they had purchased property at Sunset Beach because of its "potential growth." Finally, as will be made more clear in section II.E. of this opinion, the EA's conclusion that no Section 4(f) property is involved is now conceded by the defendants to be incorrect.

Other aspects of the administrative process indicate that NCDOT and FHWA did not take a "hard look" at the environmental consequences of the proposed bridge. *Kleppe,* 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21; *Coleman,* 555 F.2d at 400. First, the EA and FONSI fall woefully short on social impact analysis, concluding in cavalier fashion that the impact of the new bridge will be positive. Nowhere in either document is the reality of marked alterations in lifestyle and recreational opportunities resulting from increased development and a faster pace of life considered. Nowhere does either document explore or discuss potential loss of solitary activities such as birdwatching and viewing the serene and natural beauty of Sunset Beach.

Second, the environmental documents completely fail to consider the impact of the new bridge and increased development it will spur on the wood stork, piping plover, and loggerhead turtle, all of which are endangered species and have been present on Sunset Beach since the bridge-replacement project began. Although the wood stork and piping plover were not listed as endangered until after the EA was released, the loggerhead turtle has been listed since 1978. NCDOT argues that it did not know these species were present at Sunset Beach at the time it prepared the EA and FONSI. This is in part untrue, and is irrelevant. In point of fact, the EA itself recognized the existence of plovers at Sunset Beach back in 1981, though it did not refer to piping plovers specifically. More importantly, the lead agency responsible for the environmental documents is itself responsible for conducting an independent investigation to determine if threatened or endangered species are present at a proposed project site. *See North Carolina v. Hudson,* 665 F.Supp. 428, 442 (E.D.N.C. 1987). The lead agency may not take comfort in the mere silence of the United States Fish and Wildlife Service and NMFS as it did here. *See id.*

Finally, NCDOT's conclusion that its decision to dredge the Big Narrows Channel did not necessitate a reevaluation of the EA and FONSI is incredulous in light of the fact that 1) the adverse environmental effects of dredging were highlighted to the NCDOT very early in the process by both its 1979 summer biological intern and the NMFS and 2) it explicitly stated in the FONSI that no dredging was planned.

Considering all of the above flaws in the EA and FONSI, the court concludes that the determination by NCDOT and FHWA that the bridge-replacement project will not significantly affect the quality of the human environment at Sunset Beach, and that preparation of an EIS is therefore not required, is arbitrary and capricious. *See Overton Park,* 401 U.S. at 413–16, 91 S.Ct. at 822–24; *Coleman,* 555 F.2d at 399–400.

### 5. Necessity of an EIS

Even though this court has concluded that the agency decision not to prepare an EIS was arbitrary and capricious, the agencies will now be ordered to prepare such a document only if it appears through both the administrative record and the later-developed evidence presented at trial that one is required. *Citizen Advocates for Responsible Expansion, Inc. v. Dole,*

770 F.2d 423, 437 (5th Cir.1985). Viewing the evidence presented at trial through the lens of the CEQ regulations, it is clear that an EIS is required before the bridge-replacement project may proceed further. The high-density development likely to occur as the result of improved access provided by the proposed bridge, and the increased population, congestion, and pollution to follow, are surely "indirect effects" under 40 C.F.R. § 1508(b), as the regulatory definition embraces "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and other related effects on air and water and other natural systems, including ecosystems." *Id.* Moreover, under the same regulation, the aesthetic, cultural, and social alterations which the new bridge will force on Sunset Beach are cognizable "effects." *Id.*

The indirect effects of the new bridge will be "significant" as contemplated by 40 C.F.R. § 1508.27, in terms of both context and intensity. With respect to context, because this action is site-specific, the significance of the proposed bridge must be analyzed from a local perspective. *Id.* § 1508.27(a). Analyzing the replacement project from a local perspective, it is clear that the effect on the environment at Sunset Beach will be intense. Ten factors are relevant to the intensity determination. *See id.* § 1508.27(b), quoted *supra* Maj.Op. at pp. 917–918. Five are implicated by the bridge-replacement project: 1) the unique characteristics and ecologically critical areas at Sunset Beach, *id.* § 1508.27(b)(3), as recognized by NCDOT's 1979 biological intern, 2) the degree of controversy raised by the project, *id.* § 1508.27(b)–(4), which was so pronounced that NCDOT placed the project "on hold" for over three years, 3) the degree of uncertainty over the likely effects of the proposed bridge, *id.* § 1508.27(b)(5), 4) the fact that a valuable cultural resource—the pontoon bridge, described as the last of its kind in North Carolina—will be lost, *id.* § 1508.27(b)(8), and 5) the fact that endangered and threatened species will be impacted by the project, *id.* § 1508.27(b)(9).

Having fully analyzed the evidence in light of the CEQ regulations, the court concludes that the bridge-replacement project will have a significant effect on the quality of the human environment. NEPA therefore requires preparation of an EIS. *See* 42 U.S.C. § 4332(2)(C).

### C. SEPA

Plaintiffs' second claim for relief seeks to enjoin the bridge-replacement project because of defendants' failure to file an EIS in accordance with the North Carolina State Environmental Policy Act ("SEPA"), N.C.Gen.Stat. §§ 113A–1 *et seq.* SEPA also requires preparation of an EIS for publicly funded actions that significantly affect the environment. *Id.* § 113A–4(2). For the same reasons that an EIS is required under NEPA, one must be prepared in accordance with SEPA.

### D. Permits

Plaintiffs' third claim for relief seeks to void the CAMA permit, section 401 water quality certification, section 404 dredge and fill permit, and bridge permit because they were issued with the understanding that the bridge-replacement project will not have a significant effect on the environment. Although only the Coast Guard and Corps permit applications actually stated that the project will not have a significant effect on the environment, it is likely that the Coastal Area Management Agency and Division of Coastal Management were aware of the EA and FONSI when they issued their permits. Because the court has concluded that the EA and FONSI were arbitrary and capricious, and that an EIS must be prepared because of the project's significant effects on the human environment, it agrees with plaintiffs' assertion that the permitting process has been tainted. As such, the permits issued to date are invalid.

### E. Section 4(f)

Plaintiffs' fourth claim is that defendants have not complied with section 4(f) of the Transportation Act of 1966, 49 U.S.C. § 303(c), in that they failed to find 1)

that there is no prudent alternative to the use of what plaintiffs deem to be public recreation land and 2) that the proposed project includes all possible planning to minimize harm to this land. Section 4(f) provides that the Secretary of the United States Department of Transportation ("US-DOT")

> may approve a transportation program or project ... requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance ... (*as determined by the Federal, State or local officials having jurisdiction over the park, area, refuge, or site*) only if—
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreational area, wildlife and waterfowl refuge ... resulting from such use.

*Id.* (emphasis added). Defendants concluded in the EA that no section 4(f) properties are involved in the bridge-replacement project. Plaintiffs argue that the marshlands over which the bridge will cross and the ocean-front beaches to which the bridge leads are section 4(f) properties. Their argument is premised on declarations in the North Carolina Constitution, N.C. Const. art. X, § 5, North Carolina statutes, N.C. Gen.Stat. §§ 1–45.1 and 77–20(a), and cases decided by the state supreme court, *State ex rel. Rohrer v. Credle*, 322 N.C. 522, 369 S.E.2d 825 (1988); *West v. Slick*, 313 N.C. 33, 326 S.E.2d 601 (1985); *Carolina Beach Fishing Pier, Inc. v. Town of Carolina Beach*, 277 N.C. 297, 177 S.E.2d 513 (1970), which state that these lands are held in the "public trust." Plaintiffs argue that these declarations constitute a Section 4(f) finding of their significance "as determined by the Federal, State, or local officials having jurisdiction" thereof. 49 U.S.C. § 303(c). Moreover, plaintiffs claim that the boat landing which will be eliminated by the project is also held in the public trust and is, therefore, Section 4(f) property.

The court finds plaintiffs' argument that public trust land is necessarily Section 4(f) property without merit. The court agrees with the reasoning of *National Wildlife Federation v. Coleman*, 529 F.2d 359, 370 (5th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976), that even land held in the public trust must be "designated or administered, formally or informally[,]" for a purpose identified in section 4(f). *See also Ringsred v. Dole*, 828 F.2d 1300, 1304 (8th Cir.1987). No such designation has been made with respect to the wetlands or boat landing at Sunset Beach. However, defendants have conceded in a brief filed in this action that the beach is a Section 4(f) protected resource, and the court will adopt that concession as a binding judicial admission. *See United States v. Belculfine*, 527 F.2d 941, 944 (1st Cir. 1975).

Viewing the beach at Sunset Beach as Section 4(f) property, the only question left for this court to consider is whether the bridge-replacement project requires "use" of the beach. 49 U.S.C. § 303(c). The word "use" in Section 4(f) is to be construed broadly and is not limited to a physical taking; even off-site activities are included if they could create sufficiently serious impacts that would substantially impair the value of the site in terms of its prior significance and enjoyment. *Adler v. Lewis*, 675 F.2d 1085, 1092 (9th Cir.1982). The off-site activities of the proposed project must "impair substantially the value of the site in terms of its environmental, ecological, or historic significance." *Citizen Advocates*, 770 F.2d at 441. Indirect impacts sufficient to constitute such a constructive use include noise pollution, general unsightliness, and reduced access to an area. *Coalition Against a Raised Expressway, Inc. v. Dole*, 835 F.2d 803, 810 (11th Cir.1988). In fact, the determination as to what constitutes a "use" under Section 4(f) is essentially the same as the determination as to what constitutes a "significant impact" under NEPA. *Adler*, 675 F.2d at 1092.

The court concludes that the beach at Sunset Beach will be "used" by the bridge-replacement project in the same manner that the project will significantly affect the

quality of the human environment under NEPA and SEPA. *See supra;* Maj.Op. at pp. 922–923. As such, the Secretary of the USDOT was required to make Section 4(f) findings before approving the project. Because he did not, his decision was "not in accordance with law." *Overton Park,* 401 U.S. at 414, 416, 91 S.Ct. at 822–23, 823–24. The project must therefore be enjoined and may not proceed further until the appropriate Section 4(f) findings are made.

### III. CONCLUSION

For the reasons outlined above, the relief sought by plaintiffs will be granted. A separate order will issue.

### ORDER

For the reasons set forth in a Memorandum Opinion of even date herewith, defendants are hereby enjoined from letting bids or proceeding with the financing, contracting, or construction of the proposed bridge-replacement project at Sunset Beach until they have prepared and circulated for public and interagency comment an adequate environmental impact statement identifying and discussing in detail the direct, indirect, and cumulative impacts of and alternatives to the proposed project in accordance with the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4332 *et seq.* and the North Carolina State Environmental Policy Act, N.C.Gen.Stat. §§ 113A–1 *et seq.,* and have fully complied with the requirements of Section 4(f) of the Transportation Act of 1966, 49 U.S.C. § 303(c). All permits obtained to date in furtherance of this project are hereby declared null and void. The court reserves ruling on plaintiffs' request for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), pending submission of briefs by the parties. Plaintiffs' brief shall be due within 20 days, defendants' response brief within 20 days thereafter and plaintiffs' reply brief, if any, within 10 days thereafter.